188 P.3d 510 (2008)
In re the WELFARE OF M.R.H. and J.D.F., Minor Children.
Nos. 25703-7-III, 25704-5-III, 25705-3-III, 25706-1-III.
Court of Appeals of Washington, Division 3.
March 25, 2008.
Publication Ordered June 17, 2008.
*513 Jordan Broome McCabe, Attorney at Law, Bellingham, WA, Eric J. Nielsen, Casey Grannis, Nielsen Broman & Koch, PLLC, Seattle, WA, for Appellant.
Bryan Michael Spence Ovens, WA Atty. General's Office, Kennewick, WA, for Respondent.
THOMPSON, J.[*]
¶ 1 Mark David Forsythe and Leanne Kay Hurd appeal the trial court's termination of their parental rights. They contend the court's findings on the required statutory factors were unsupported by the evidence. Ms. Hurd also contends the termination statutes are unconstitutional. We affirm.
¶ 2 Mark Forsythe and Leanne Hurd are the parents of M.R.H., born July 18, 1998 and J.D.F., born July 31, 2000. Beginning in May 2000, when M.R.H. was 22 months old, police officers and Child Protective Services (CPS) workers were called to Ms. Hurd's home to respond to complaints that her children were playing unsupervised in the street. Throughout the next year, Ms. Hurd was warned on numerous occasions to not let her children play in the street. Ms. Hurd, however, was uncooperative with CPS investigators and the police.
¶ 3 On December 5, Ms. Hurd obtained a protection order against Mr. Forsythe alleging that he had physically harmed her and was verbally abusive to the children. That same month the Department of Social and Health Services (Department) placed the children in protective custody and a dependency petition was filed.
¶ 4 On May 18, 2001, Ms. Hurd obtained a 10-year no contact order against Mr. Forsythe. The dependency petitions were dismissed later that year, after Ms. Hurd agreed to participate in services and keep Mr. Forsythe out of her home. The no contact order and protection orders, however, were repeatedly violated by Ms. Hurd and Mr. Forsythe. Mr. Forsythe broke into Ms. Hurd's home on two occasions and Ms. Hurd continued to allow Mr. Forsythe to come to her home and spend the night.
¶ 5 On September 7, 2003, Mr. Forsythe was arrested for being in Ms. Hurd's home and violating his no contact provisions. Ms. Hurd was also arrested for refusing to cooperate with the police. On October 16, police were dispatched to Ms. Hurd's home to investigate another complaint that her children were in the street unsupervised.
¶ 6 On October 23, a CPS investigator spoke with M.R.H.M.R.H. told the investigator that Mr. Forsythe hit Ms. Hurd and that he would hide when they fought. On October 28, Mr. Forsythe was incarcerated for a burglary conviction and for violating his no contact order. The next day, the children were removed from Ms. Hurd's home and dependency petitions were filed. On October 31, Ms. Hurd told the CPS investigator that she believed that Mr. Forsythe was not a good man, but she allowed him into her home despite the no contact order, because he was the children's father. She said that it was not against the law for her children to play in the street and that if they were hit by a motorist, the motorist would be criminally charged. She also told the investigator that "children die all the time" and that "they get kidnapped, raped and murdered." 2 Report of Proceedings (RP) (May 11, 2003) at 203.
*514 ¶ 7 On January 8, 2004, a dependency order was entered as to Mr. Forsythe finding that the children had no parent capable of adequately providing for their care.[1] A dependency order was entered on February 24 as to Ms. Hurd finding that the children had been abused or neglected and that the children had no parent capable of adequately providing for their care, such that the children were in circumstances which constituted a danger of substantial damage to the children's psychological or physical development.
¶ 8 The disposition order required Mr. Forsythe to complete the following services: (1) a substance abuse assessment and follow through with any treatment recommendations; (2) comply with a psychological evaluation to determine his level of functioning, mental and emotional state, and the ability to protect and parent his children; and (3) obtain a new domestic violence evaluation and follow all recommended treatment. Mr. Forsythe was also required to abide by the protection and no contact orders, comply with his pending criminal matters, acquire adequate housing and maintain employment, apprise his social worker of any changes in circumstance as well as maintain contact with his social worker to discuss his progress/compliance with services and to provide his social worker with progress reports from service providers.
¶ 9 Ms. Hurd's disposition order required her to abide by the protection and no contact orders against Mr. Forsythe, comply with her criminal cases, maintain stable housing and employment, abide by the visitation schedule, apprise her social worker of any changes in circumstances as well as to maintain contact to discuss progress/compliance with services, and provide her social worker with progress reports of service providers. She was also required to participate in the following services: (1) commence an outpatient treatment program immediately; (2) comply with a neuro-psychological evaluation to determine her current level of functioning, mental and emotional state, and the ability to protect and parent her children, as well as follow through with any recommended treatment programs; (3) participate in a bonding assessment; and (4) participate in a neurological evaluation.
¶ 10 The dependency and disposition orders were reviewed by the court on April 13, 2004, September 14, December 14, December 21, January 18, 2005, and April 19. During each review hearing, the court found that Ms. Hurd and Mr. Forsythe had failed to comply with their court ordered services and the children remained in foster care with their maternal aunt. Additional services were then offered to Ms. Hurd and Mr. Forsythe. Ms. Hurd was required to: (1) complete a substance abuse assessment; (2) apprise her social worker of any changes of address and telephone number; (3) maintain weekly contact with her social worker; (4) provide her social worker with progress reports by service providers within two weeks of completing a service; (5) participate in individual counseling and demonstrate integration of techniques learned; (6) complete a sexual deviancy evaluation and comply with all recommendations; (7) comply with psychiatric treatment as recommended by her therapist; and (8) sign releases of information forms immediately for service providers. Mr. Forsythe was also required to complete the additional following services during his incarceration: (1) a standardized stress/anger management course; (2) victim awareness service; (3) family dynamics/parenting course; and (4) other services as available in the correctional facility.
¶ 11 On April 25, 2005, the Department filed a termination petition. Ms. Hurd then moved to Texas with her boyfriend and refused to disclose her whereabouts to the Department. Mr. Forsythe remained incarcerated until October 2005. He participated in classes and evaluations while in prison, but *515 failed to establish contact with his social worker and did not enroll in services after his release from prison. On May 10, 2006, the termination trial commenced.
¶ 12 At trial, Ms. Hurd testified that Mr. Forsythe was first physically violent toward her when M.R.H. was six months old. She said she was holding M.R.H. when Mr. Forsythe "head-butted" her and that she had to go to the hospital because she was bleeding. 1 RP (May 10, 2006) at 11. Ms. Hurd said that Mr. Forsythe had struck her or been physically violent toward her about 10 times and that every time it happened, he would be drinking. She said she thought he was "psycho" and that the children were around when he was drinking, yelling and physically assaultive. 1 RP (May 10, 2006) at 15-16. Ms. Hurd said that Mr. Forsythe was always getting mad at the children for little things and that he called them names and insulted them. She said he tore up the children's toys and kicked holes in the walls. She said she sought a protection order against Mr. Forsythe, because he was getting more physically abusive, despite being in anger management classes. Ms. Hurd said that she felt it was okay for children to be exposed to domestic violence, because it helped her to be a more aggressive person after being exposed to such violence herself as a child.
¶ 13 Ms. Hurd testified as follows: After the children were removed in October 2003, she took parenting classes; she did not learn anything in the class and had been learning how to parent from reading magazines; she also went to domestic violence counseling, but said she did not need the help, because she felt like she was doing a good job handling it herself; the Department continued to add services, so she quit participating in them; she felt like she was a good parent, but was being targeted by the Department and that it was tampering with her water and violating her civil rights; she refused psychiatric treatment because she did not think she had a psychological problem; she did not know if she wanted her children to move back in with her because it was going to be a lot of work.
¶ 14 Mr. Forsythe testified he was only physically violent towards Ms. Hurd on three occasions because she was having an affair; he did not go to the court-ordered anger management classes because he had previously attended such a class in 2000 and did not think he was in need of that service; he did not contact his social worker when he was released from prison because he had a lawyer that was handling the matter; he was aware that services were being recommended to him, but that he had already completed parenting and anger management classes; he was aware that a drug and alcohol assessment was requested by the Department, but he was attending Alcoholics Anonymous (AA) meetings three to four times a week; he did not produce any lists or documentation from those meetings, because he had not been ordered to; he did not participate in any drug and alcohol treatment classes while in prison, except for the AA meetings; he had been sober for two and one-half years  18 months of which was during his incarceration; he voluntarily took a parenting class and obtained an anger management certificate while in prison.
¶ 15 Mr. Forsythe testified that he did not request visitation with the children from his social worker and it had been two and one-half years since he had seen M.R.H. and J.D.F.; he never abused his children and was not a neglectful parent; there was only one time when the children were in his care that M.R.H. unlocked the door of the house while he was sleeping and wandered to a hospital where a police officer found M.R.H. and brought him home. He said that the domestic violence occurred in his home when arguments "got out of hand" and that the children's comments about the violence were false. 1 RP (June 1, 2006) at 125.
¶ 16 Mr. Forsythe further testified that he had not yet had the alcohol evaluation as requested by the Department because he was waiting for an appointment. He said that since his release from incarceration, he had been working in California but thought it was in his best interests to be reunited with his children and that he would do whatever it took to see his children.
¶ 17 Mental health counselor, Lynn Lang, testified next. She said the Department referred M.R.H. and J.D.F. to her in April *516 2004 and that she saw them for a period of six months. The children's references to the police led her to believe that the children may have been exposed to domestic violence or neglect. She also testified that the children had conflicted feelings about their parents and that M.R.H. had said that he did not like his mother; he had a lot of unanswered questions about his father; the children did not have permanency during the time she was seeing them and she felt that this was related to their conflicted feelings about their parents. Ms. Lang said that reintroducing a parent after a long period of time where the child previously had conflicting emotions might make the child anxious and that that would be hard for a child to cope with. She was of the opinion the children were unsure of where their future was or where they were going to end up. She had not had any direct involvement with the children for one and one-half years, but felt the children needed a safe, stable environment, and needed to be adopted.
¶ 18 The Department's Child Welfare Supervisor, Ryan Greenhalgh, then testified. Mr. Greenhalgh testified that he was responsible for the case for only 14 days, but that Mr. Forsythe had not participated in any services since he had been out of prison to determine whether the classes he took while in prison were successful. He said Mr. Forsythe had been out of the children's lives for some time by the termination trial and that Ms. Hurd had been out of their lives for one year. Additionally, he testified that the children had been in foster care since October 2003 and that Mr. Forsythe and Ms. Hurd had had plenty of time to correct their parental deficiencies but had not; he did not believe Mr. Forsythe and Ms. Hurd were capable of correcting their parental deficiencies and providing a stable home to their children; the children needed to be adopted and it would be unfair to let their parents back into their lives after so long, because the children were moving on and making strides; he believed termination of Mr. Forsythe's and Ms. Hurd's parental rights were in the children's best interests.
¶ 19 Tina Khabir, the children's guardian ad litem (GAL) was then called to testify. Ms. Khabir testified she was assigned to the case in November 2003. She met with Ms. Hurd after the dependency proceedings and Ms. Hurd said that she did not need the court ordered programs and just wanted the Department to get out of her business so that she could take care of her children. She had observed Ms. Hurd with the children and felt that Ms. Hurd was not an affectionate mother. She said that Ms. Hurd did not show any expression with the kids and would not initiate much interaction with them. She said that she did not get the opportunity to witness the children's interactions with Mr. Forsythe, because he was in prison. Ms. Khabir said she met with Mr. Forsythe on November 11, 2003 to discuss services with him, such as parenting classes, drug and alcohol assessments, anger management classes and individual counseling and that he had a positive attitude, but that Mr. Forsythe had not contacted her since October 2005.
¶ 20 Ms. Khabir described the present home environment for the children as a happy, family oriented environment; the children's foster parents can meet the children's long term needs and they are willing to adopt the children; the children are happy, have bonded with their foster parents, and are involved in all kinds of activities; she felt it was in the children's best interest for Mr. Forsythe and Ms. Hurd to relinquish their parental rights; the children should not be returned to Ms. Hurd, because Ms. Hurd's attitude that she did not have a problem had not changed much in two and one-half years; the children were in limbo and life could not proceed normally for them until relinquishment of Mr. Forsythe's and Ms. Hurd's parental rights; the children were still scared that the current home they were in was not a permanent home and that was not healthy for them.
¶ 21 Department social worker, Connie Drake, testified she had been assigned to Mr. Forsythe and Ms. Hurd's case in January 2004. During the course of the dependency, Ms. Hurd had not met the outcomes or fixed the issues that started the proceedings. She said she had concerns about Ms. Hurd's ability to parent more than one child and she thought the risk of neglect was too high. *517 She stated that all the psychological evaluations conducted indicated that Ms. Hurd was suffering from mental decompensation and she was concerned about Ms. Hurd's ability to parent due to her psychiatric issues. She had not had the opportunity to discuss the recommendations for psychiatric treatment with Ms. Hurd, because Ms. Hurd said she did not need treatment and would not participate in treatment. Ms. Drake said there was no marked improvement in Ms. Hurd between 2004 and the termination trial in 2006.
¶ 22 Ms. Drake testified as to Mr. Forsythe as follows: He had been in prison for most of the duration of the case; he had not engaged with the Department while in prison or after his release; she had no information Mr. Forsythe was sober or had participated in domestic violence services; he had participated in domestic violence training once before, but had been convicted of domestic violence after this training; she had not been provided with documentation to support his assertion that he was participating in AA meetings; Mr. Forsythe submitted a psychological report from a Department of Corrections (DOC) psychologist conducted on September 27, 2004 while Mr. Forsythe was incarcerated, but the report did not cover all the issues necessary for the Department.
¶ 23 Ms. Drake was of the opinion it was not in the children's best interests to have contact with Mr. Forsythe, because they had no recent memories of him other than those dealing with abuse and that contact with him could traumatize the children. She said that Mr. Forsythe needed to show he was sober, he was remedying the domestic violence situation and he needed to show empathy for females and female caregivers. She further testified that Mr. Forsythe had been given the opportunity since October 2005 to engage in services and get his children back, but he had not done anything. She did not think things would change in the foreseeable future and the children still had anxiety concerning permanency issues and were in a relative placement with maternal relatives that they called "mom" and "dad." She said that it was in the children's best interests that Mr. Forsythe's and Ms. Hurd's parental rights be terminated.
¶ 24 The children's counselors then testified. Jennifer Dulamaine, J.D.F.'s therapeutic counselor, testified that J.D.F. began treatment with her on December 15, 2004. J.D.F. told her that Mr. Forsythe was mean to Ms. Hurd and hit her. That was the only time that J.D.F. talked about his father. Any contact for J.D.F. with his biological parents would have to be strictly supervised, because such visitation could cause extreme negative behavioral responses from him.
¶ 25 M.R.H.'s therapeutic counselor, Enrique Zalazar, testified that M.R.H. did not refer to feelings or memories about Mr. Forsythe during treatment. He said that M.R.H. benefits from the stability of his current home and needs continuity, structure and boundaries. Mr. Zalazar said that the reintroduction of M.R.H.'s biological parents would affect his structure and stability.
¶ 26 Licensed clinical psychologist, Dr. Philip Barnard, was then called to testify. Dr. Barnard performed a psychological evaluation of Ms. Hurd and Ms. Hurd told him Mr. Forsythe treated her "very badly" and was physically and emotionally abusive. His testimony was that Ms. Hurd's personality inventories revealed she had a psychotic disorder, delusional disorder and paranoid personality features. He said he also reviewed the psychological evaluation of Mr. Forsythe conducted by DOC in 2004. He was not familiar with the tests administered, because they were meant for incarcerated individuals and predominately had to do with early release dates and recidivism issues. He said that the evaluation did not address parenting issues in depth whatsoever.
¶ 27 At the conclusion of the trial, the court terminated Mr. Forsythe's and Ms. Hurd's parental rights to M.R.H. and J.D.F. This appeal follows.
¶ 28 Mr. Forsythe and Ms. Hurd contend the court erred by terminating their parental rights. They argue that the court's findings of fact were unsupported by the evidence.
¶ 29 Parents have a fundamental right to the care and custody of their children, and a trial court asked to interfere with that right should employ great care. In re Welfare of H.S., 94 Wash.App. 511, 530, 973 *518 P.2d 474 (1999), cert. denied, 529 U.S. 1108, 120 S.Ct. 1960, 146 L.Ed.2d 792 (2000). RCW 13.34.180(1) governs the termination of parental rights and sets forth six factors the Department must allege and prove in a termination hearing.
[1] That the child has been found to be a dependant child;
[2] That the court has entered a dispositional order pursuant to RCW 13.34.130;
[3] That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
[4] That services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
[5] That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . .
[6] That continuation of the parent and child relationship clearly diminishes that child's prospects for early integration into a stable and permanent home.
¶ 30 A court may terminate parental rights if the Department proves the elements of RCW 13.34.180(1) by clear, cogent and convincing evidence. RCW 13.34.190(1). "Clear, cogent and convincing" means highly probable. In re Dependency of K.R., 128 Wash.2d 129, 141, 904 P.2d 1132 (1995). Additionally, the trial court must find by a preponderance of the evidence that termination is in the best interests of the child. RCW 13.34.190(2).
¶ 31 The court's factual findings under RCW 13.34.180(1) must be upheld if supported by substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent and convincing evidence. In re Dependency of C.B., 61 Wash. App. 280, 286, 810 P.2d 518 (1991). Because only the trial court has the opportunity to hear the testimony and observe the witnesses, its decision is entitled to deference and this court will not judge the credibility of the witnesses or weigh the evidence. In re Dependency of A.V.D., 62 Wash.App. 562, 568, 815 P.2d 277 (1991).
¶ 32 Mr. Forsythe and Ms. Hurd first contend that the Department failed to provide all services reasonably necessary to correct their parental deficiencies. Specifically, Mr. Forsythe argues that (1) the Department did not offer him services during his incarceration; (2) that it was the Department's responsibility to take the necessary steps to arrange for a psychological evaluation, if the DOC evaluation was insufficient; and (3) that the lack of documentation to prove his sobriety could have been established via a urinalysis test. Both Mr. Forsythe and Ms. Hurd also argue that they were denied visitation with their children.
¶ 33 Under RCW 13.34.180(1)(d), the Department is obligated to offer or provide services that are capable of correcting parental deficiencies within the foreseeable future. But even where the Department "inexcusably fails" to offer services to a willing parent, termination will still be deemed appropriate if the services "would not have remedied the parent's deficiencies in the foreseeable future, which depends on the age of the child." In re Dependency of T.R., 108 Wash.App. 149, 164, 29 P.3d 1275 (2001). Where the record establishes that the offer of services would be futile, the trial court can make a finding that the Department has offered all reasonable services. In re Welfare of Ferguson, 32 Wash.App. 865, 869-70, 650 P.2d 1118 (1982), rev'd on other grounds, 98 Wash.2d 589, 656 P.2d 503 (1983).
¶ 34 Here, the testimony at trial established that the Department offered Mr. Forsythe services both prior to and after his incarceration, but that he did not feel that he was in need of such services. According to the record, Mr. Forsythe had met with the children's GAL prior to his incarceration to discuss what services he needed to accomplish. Although it does not appear that Mr. Forsythe was offered services by the Department during his incarceration, he made no attempt or was unwilling to participate in *519 services once he was released from prison. Mr. Forsythe admitted at trial he was physically violent during his relationship with Ms. Hurd, but he did not go to the court ordered anger management classes because he had previously attended such a class and did not think he was in need of that service. He also said he was aware parenting classes were being recommended to him during the course of the proceedings, but he did not feel he had to engage in those services because he had previously completed such a class. He also said he was aware that a drug and alcohol assessment was also requested by the Department, but he was attending AA meetings.
¶ 35 Moreover, Mr. Forsythe's disposition order specifically identified that his psychological evaluation had to address his ability to parent his children, but the only evaluation he submitted was conducted while he was incarcerated and was tailored to address recidivism rates and early release dates. It did not address his ability to parent his children as required by the court. Moreover, Mr. Forsythe admitted he did not contact his social worker when he was released from prison, because he had a lawyer handling the matter, but there was no evidence at trial any lawyer was working with the Department to ensure that Mr. Forsythe maintain contact with his social worker and complete the necessary services. Where the Department offers services, but the parent refuses to participate, RCW 13.34.180(1)(d) is satisfied. Ferguson, 32 Wash.App. at 869-70, 650 P.2d 1118.
¶ 36 Mr. Forsythe and Ms. Hurd also argue the Department failed to provide them with visitation services. Generally, "[t]he agency shall encourage the maximum parent and child . . . contact possible, when it is in the best interest of the child, including regular visitation." RCW 13.34.136(1)(b)(ii). But visitation may be limited or denied "if the court determines that such limitation or denial is necessary to protect the child's health, safety, or welfare." RCW 13.34.136(1)(b)(ii). Moreover, the agency is not required to develop a plan of services for the parents or provide services to the parents if the court orders that a termination petition be filed. RCW 13.34.136(c). After a termination petition has been filed, visitation is only required pending a fact-finding hearing on the termination petition if visitation would be in the best interests of the child. Id.
¶ 37 Here, Mr. Forsythe admitted he had made no effort to contact the Department to request visitation with his children both during and after his incarceration. He testified at trial it had been two and one-half years since he had seen them. Although Ms. Hurd's domestic violence no contact order prohibited Mr. Forsythe from contacting the children, he made no effort to modify the order so he could begin visitation with the children. Moreover, there was testimony at trial to establish it was not in the children's best interest to have contact with Mr. Forsythe or reintroduce him into their lives. Given that Mr. Forsythe did not request visitation with his children and there was nothing to establish such visitation would be in the best interests of the children, it was not error for the Department to not offer regular visitation.
¶ 38 Furthermore, Ms. Hurd's contention on appeal relates back to the dependency proceeding and therefore the record on her appeal of the termination of her parental rights does not contain any evidence pertaining to the Department's request to suspend her visitation with the children or the circumstances surrounding the court's decision to deny her visitation during the dependency. This issue thus is not properly before this court. See RAP 9.2(b) ("A party should arrange for the transcription of all those portions of the verbatim report of proceedings necessary to present the issues raised on review.").
¶ 39 Mr. Forsythe and Ms. Hurd also contend the Department failed to prove there was little likelihood that conditions would be remedied within the foreseeable future. Mr. Forsythe argues there was no evidence he was currently unfit. Ms. Hurd argues the court's finding concerning this factor was premature, because the Department failed to provide her with visitation. The focus of this factor, however, is whether *520 the identified deficiencies have been corrected. K.R., 128 Wash.2d at 144, 904 P.2d 1132.
¶ 40 Here, both Mr. Forsythe and Ms. Hurd were offered services by the Department but both were unwilling to complete the services as identified in the disposition orders and required by the court during subsequent review hearings throughout the two years preceding the termination trial. Moreover, Mr. Forsythe and Ms. Hurd's social worker testified that she did not believe things would change in the foreseeable future. A matter of months for young children is not within the foreseeable future to determine if there is sufficient time for a parent to remedy his or her parental deficiency. In re Welfare of Hall, 99 Wash.2d 842, 844, 850-51, 664 P.2d 1245 (1983) (eight months not in foreseeable future of four-year-old); In re Matter of A.W., 53 Wash.App. 22, 31-32, 765 P.2d 307 (1988) (one year not in the foreseeable future of three-year-old), review denied, 112 Wash.2d 1017 (1989); In re Dependency of P.D., 58 Wash.App. 18, 27, 792 P.2d 159 (six months not in the near future of 15-month-old), review denied, 115 Wash.2d 1019, 802 P.2d 125 (1990). There was substantial evidence to support the court's finding on this factor.
¶ 41 Mr. Forsythe next contends the trial court's conclusion that termination was in the best interests of the children constituted error, because any finding on this issue was premature. He argues he had satisfied all dependency conditions and he requested at the termination trial he be allowed to gradually return to his children's lives with the start of visitation sessions. He argues the lack of record of any visitation rendered the court's finding on this factor baseless. Although no specific factors are involved in a best interest determination, "each case must be decided on its own facts and circumstances." A.V.D., 62 Wash.App. at 572, 815 P.2d 277.
¶ 42 Here, the record establishes substantial evidence supported the court's finding termination was in M.R.H.'s and J.D.F.'s best interest. The children's counselors testified that reintroducing Mr. Forsythe into their lives after so long could cause them to be anxious, to have extreme negative behavioral responses, and the children needed structure and stability. The children's GAL testified the children were happy and bonded to their foster parents. The Department also presented evidence adoption of the children was in their best interests so that they would not be in limbo any longer.
¶ 43 The children had been dependent for nearly two and one-half years before termination of Mr. Forsythe's parental rights. Mr. Forsythe had made minimal progress in completing or utilizing the necessary services to regain custody of his children and in fact admittedly had not made any effort to see his children for two and one-half years. Based on the evidence presented at trial, the court did not err in finding termination was in the best interests of the children. RCW 13.34.190.
¶ 44 Ms. Hurd next contends the termination statutes, RCW 13.34.180 and RCW 13.34.190, are unconstitutional. She argues they are not narrowly drawn to meet a compelling Department interest.
¶ 45 Interpreting a statute and determining whether a statute is unconstitutional are questions of law we review de novo. In re Parentage of C.A.M.A., 154 Wash.2d 52, 57, 109 P.3d 405 (2005). A statute is presumed constitutional, and parties asserting that a statute is facially unconstitutional must also prove no circumstances exist in which the statute, as currently written, can be constitutionally applied. State v. Coria, 120 Wash.2d 156, 163, 839 P.2d 890 (1992); In re Dependency of I.J.S., 128 Wash.App. 108, 115-16, 114 P.3d 1215, review denied, 155 Wash.2d 1021, 128 P.3d 1240 (2005).
¶ 46 The courts have historically recognized a biological parent has a fundamental liberty interest in the care, custody and control of his or her child. Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); In re Welfare of Sumey, 94 Wash.2d 757, 762, 621 P.2d 108 (1980). However, this fundamental right is not absolute. Sumey, 94 Wash.2d at 762, 621 P.2d 108. The Department has both a right and an obligation as parens patriae to intervene *521 to protect the child when the parent's actions or inactions endanger the child's physical or emotional welfare. Id. Under RCW 13.34.180 and RCW 13.34.190, a court may terminate parental rights if it finds (1) the requisite allegations are supported by clear, cogent and convincing evidence; and (2) termination is in the best interests of the child.
¶ 47 Ms. Hurd argues the Washington termination statutes are unconstitutional because they improperly allow the court to terminate parental rights without a finding of harm to the child. She also argues the termination statutes do not require the Department to prove a less restrictive alternative, such as guardianship or open adoption, would be harmful before terminating parental rights. Division One and Division Two of this court have recently addressed these arguments in In re Dependency of I.J.S., 128 Wash.App. at 118, 114 P.3d 1215, and In re Welfare of C.B., 134 Wash.App. 336, 342, 139 P.3d 1119 (2006), which we are persuaded we should follow.
¶ 48 The "best interests of the child" is insufficient to serve as a compelling Department interest overruling a parent's fundamental right in his or her children. In re Custody of Smith, 137 Wash.2d 1, 20, 969 P.2d 21 (1998), aff'd sub. nom, Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). But Department interference with a parent's protected right to raise his or her children is allowed where the Department seeks to prevent harm or the risk of harm to the child. Id. at 18, 969 P.2d 21. Thus, the Department can constitutionally intrude on parental rights only when parental actions seriously conflict with the child's physical or mental health. Id.
¶ 49 As both Division One and Division Two have observed, the termination statutes require the Department to show termination of the parent-child relationship is necessary to prevent harm to the child. I.J.S., 128 Wash.App. at 117-18, 114 P.3d 1215; C.B., 134 Wash.App. at 344-45, 139 P.3d 1119. Although the termination statutes focus on a best interest of the child standard, the Department must prove the six statutory factors set forth in RCW 13.34.180 and that the child's relationship with its parents actually or potentially harms the child. Id. Only after the Department proves these statutory factors will the court consider whether a preponderance of the evidence establishes termination is in the best interests of the child. Id. Therefore, although the statute does not expressly utilize a "harm to the child" standard, the Department is required to demonstrate termination of parental rights is required to prevent harm or risk of harm to the child. Id.
¶ 50 Moreover, the trial court is not required to consider guardianship or open adoptions as a least restrictive alternative if no such petition or request has been filed. I.J.S., 128 Wash.App. at 120, 114 P.3d 1215; C.B., 134 Wash.App. at 345-46, 139 P.3d 1119. The statutory factors of RCW 13.34.180 also require the Department to (1) prove that continuation of the parent-child relationship will harm the child and in such circumstances, guardianship would not be an appropriate alternative to termination; and (2) provide services to cure parental deficiencies providing the parent with a less restrictive alternative before the termination of parental rights. C.B., 134 Wash.App. at 345, 139 P.3d 1119 (quoting RCW 13.34.180(1)(d)(e)(f)).
¶ 51 Because RCW 13.34.180 and RCW 13.34.190 require the Department to prove its request to terminate parental rights is based on the prevention of harm or risk of harm to the children and require the Department to provide the parent with a less restrictive alternative before termination, the statutes survive strict scrutiny and are constitutional.
¶ 52 Affirmed.
WE CONCUR: BROWN and KULIK, JJ.
NOTES
[*] Judge Philip J. Thompson is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.
[1] Mr. Forsythe asserts that the dependency order was entered without his knowledge or consent. Br. of Appellant at 3. Mr. Forsythe, however, did not appeal the dependency disposition order, and cannot now argue that the order was improper in an appeal of the termination order. In re Dependency of T.H., 139 Wash.App. 784, 792-93, 162 P.3d 1141 (2007) (stating that if a parent wishes to challenge the propriety of the underlying dependency order, he must do so in an appeal of the disposition order or a petition for discretionary review of other orders entered by the dependency court), review denied, 162 Wash.2d 1001 (2007).