# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of A.N.S., DOB: 03/13/09, | ) ) ) DIVISION ONE |
| Minor child. | ) ) No. 70765-5-I |
| MICHELLE SPRUEL, | ) ) UNPUBLISHED OPINION |
| Appellant, | ) ) |
| v. | ) ) |
| STATE OF WASHINGTON, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | ) ) ) ) |
| Respondent. | ) FILED: July 21, 2014 ) |

COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED
2014 JUL 21 AM 10: 58

DWYER, J. — Michelle Spruel appeals from the trial court's order terminating her parental rights to her daughter, A.N.S. Spruel contends that the order terminating her parent-child relationship must be reversed because the State failed to prove by clear, cogent, and convincing evidence, pursuant to RCW 13.34.180(1), that all necessary services "capable of correcting the parental deficiencies within the foreseeable future" were provided to her, and that there was little likelihood that her parental deficiencies would be remedied in the near future. Additionally, Spruel assigns error to the trial court's finding that

termination of her parental rights was in A.N.S.'s best interests, arguing that—in light of the State's failure to satisfy its statutory burden—the trial court should not have made a "best interests" determination. However, substantial evidence supports the trial court's findings as to the statutory factors. Hence, we need not determine whether the trial court erred in its "best interests" determination. Accordingly, we affirm the trial court's order.

I

A.N.S. was born on March 13, 2009. Her biological mother is Michelle Spruel. Spruel has one other child from another relationship, S.O. However, S.O. is not a party to this termination proceeding.

In September 2011, the Department of Social and Health Services (the Department) learned that Spruel was using heroin while pregnant with S.O., and that A.N.S. was being physically abused. During its subsequent investigation, the Department was contacted by Swedish Hospital to inform the Department that S.O. had been born prematurely and with serious medical complications. Swedish Hospital reported that both Spruel and S.O. tested positive for amphetamines and opiates at the time of S.O.'s birth.

On October 11, 2011, A.N.S.—who was two years old at the time—was placed into protective custody and a dependency petition was filed, alleging that she was a dependent child. On December 6, Spruel signed an agreed order finding A.N.S. to be dependent, pursuant to RCW 13.34.030(6)(c). Spruel agreed that she had substance abuse issues that needed to be remedied. On the same day, Spruel agreed to a disposition order requiring her to participate in

(1) interactive parenting classes, (2) a drug and alcohol evaluation, (3) random urinalysis testing, (4) a psychological evaluation with parenting component, and (5) individual counseling. In subsequent dependency orders, Spruel was also ordered to complete intensive inpatient drug treatment and to develop a relapse prevention plan, as recommended by her psychological and drug and alcohol evaluations. However, the disposition order reserved the issue of A.N.S.'s placement for later hearing. On February 23, 2012, the court ordered that A.N.S. was to be placed in an out of care home, where she has remained since.

Department social worker Whitney Lagadinos was assigned to Spruel's case from November 2011 to July 2012. She communicated with Spruel regularly and provided her with referrals for services. Spruel was given referrals for parenting classes, mental health counseling, and drug and alcohol assessments. Spruel was referred to SeaMar Community Health Center for a drug and alcohol evaluation in November 2011, but failed to appear for three scheduled appointments. After the third missed appointment, Spruel was referred to Evergreen Manor for an assessment. Spruel again failed to appear for three scheduled appointments.

In April 2012, following the spate of missed appointments, Spruel was again referred to SeaMar for a drug and alcohol evaluation. Although Spruel missed her first scheduled appointment, she appeared for a subsequent appointment on April 18 and completed an evaluation with Margaret Smith. Spruel reported a history of depression and addiction to heroin and methamphetamine. She admitted to daily heroin use, admitted to simultaneously

using heroin and methamphetamine in the previous six months, and admitted that she had pending criminal charges for theft and possession of narcotics. Smith diagnosed Spruel with polysubstance dependence and recommended that she complete a 30-day inpatient treatment program followed by a 180-day stay at a sober living recovery house. Smith provided Spruel with housing information, referred her for a detoxification bed, and arranged for her to begin inpatient drug and alcohol treatment on April 30. Spruel, however, failed to appear for detox and inpatient treatment. Smith continued to make efforts to engage the mother in treatment but was unsuccessful.

During this time, Spruel struggled to avail herself of visitation with A.N.S. By March 2012, Spruel had missed 11 visits with A.N.S. At a review hearing on March 2, the juvenile court ordered Spruel to contact the visit supervisor 90 minutes in advance of the scheduled visit, otherwise A.N.S. would not be transported for the visit. The juvenile court also found that Spruel was not in compliance with remedial services and had made no progress toward reunification.

When Spruel did visit A.N.S., Spruel exhibited volatile, inappropriate behavior. In February 2012, Spruel and the father of S.O. engaged in a verbal and physical altercation in the lobby of the visitation area. Spruel screamed at the father and shoved him against a wall. A.N.S. witnessed S.O.'s father, who was upset, after the incident. On March 7, Spruel became upset in front of A.N.S. when she noticed a bruise on A.N.S.'s leg and what she perceived to be a dog bite. Although the social worker did not find the marks concerning, Spruel

- 4 -

raised her voice, held A.N.S. to her, and threatened to call 911. A.N.S. was removed from the visit and Spruel had to be escorted from the building. A.N.S. had an unusually "flat affect."

On March 9, after waiting for an hour for Spruel to arrive at a scheduled visit, A.N.S. was returned to her foster home. When Spruel finally arrived, she became incensed and demanded that A.N.S. be returned for the visit. She began hitting walls, slamming doors, and yelling before locking herself in a bathroom stall. Christine Cavanagh, a social worker, tried unsuccessfully to coax Spruel out of the bathroom. Cavanagh believed that Spruel was under the influence of drugs. Cavanagh discussed with Spruel the need for her to seek ounseling. During this time, Spruel made suicidal statements. In response, Cavanagh called the police; Spruel was then placed into custody and involuntarily committed at Swedish Hospital for 14 days for a psychiatric evaluation. It was discovered that Spruel had amphetamines in her system at the time.

On March 21, the juvenile court suspended Spruel's visits with A.N.S. The court found that Spruel's erratic behavior and violent outbursts posed a risk of harm to A.N.S.'s health, safety, and well-being, as demonstrated by A.N.S.'s adverse reactions to these episodes. The court ordered Spruel to provide two weeks of clean urinalysis tests and complete a mental health intake appointment before visitation could be reinstated. Spruel failed to satisfy these requirements, and visitation remained suspended for the remainder of the dependency.

In August, Cavanagh referred A.N.S. to a child mental health specialist—Rebecca Perbix Mallos—for a mental health evaluation. Cavanagh did so because A.N.S. was throwing violent tantrums, exhibiting hypervigilence with food, and exhibiting indiscriminate affection to strangers. Perbix Mallos diagnosed A.N.S. with anxiety, posttraumatic stress disorder, aggression, and reduced emotional reactivity. She opined that A.N.S. was under stress and was traumatized, and that she needed stability and permanency. A.N.S. began participating in weekly trauma therapy with Perbix Mallos. As part of this therapy, A.N.S.'s foster parents were asked to use therapeutic parenting skills "to repair what has been done to her and to provide what she didn't get from adults previous to this placement." During the pendency of A.N.S.'s therapy, Perbix Mallos continued to recommend that visitation remain suspended for fear of re-traumatizing A.N.S. It was Perbix Mallos's professional opinion that visitation with Spruel or attempts at reunification would be extremely detrimental to A.N.S.

On October 26, 2012, six months after substance abuse treatment was first recommended and more than one year after A.N.S. was removed from Spruel's custody, Spruel began a 30-day inpatient treatment program at SeaMar. However, due to disruptive behavior, she was discharged after six days. Margaret Smith of SeaMar continued to work with Spruel to obtain treatment—including a referral to a dual diagnosis program designed to address both mental illness and substance abuse—but Spruel failed to avail herself of any services. In November, Spruel was admitted to the Harborview Hospital addiction/psychiatric ward for mental health treatment, after she experienced

auditory and visual hallucinations. After 14 days, Spruel was discharged to the Downtown Emergency Shelter in Seattle, which serves homeless persons with mental disabilities.

In December, Spruel was again referred for inpatient substance abuse treatment, this time at Riel House in Yakima, Washington. After just 12 days, however, Spruel was discharged due to mental health problems and angry outbursts. Spruel then entered inpatient substance treatment at Prosperity House, which she completed on January 18, 2013. The discharge summary noted that Spruel continued to exhibit thought processes and behaviors that suggested an underlying mental health disorder including: "belief in persecution, volatile verbal explosions, poor impulse control, and disordered thinking." It was recommended that Spruel complete a psychological evaluation and begin outpatient services with Sound Mental Health. Although Spruel began this treatment, she relapsed on heroin in February 2013. Following her relapse, she began the dual diagnosis program and counseling at Sound Mental Health in February and March. By June, Spruel had missed a quarter of her counseling sessions and was just beginning to address her mental illness.

Spruel was initially referred for a psychological evaluation in February 2012, which she failed to attend. In May 2013, she was referred to and completed a psychological evaluation with Dr. Robert Deutsch. Dr. Deutsch diagnosed Spruel with depressive disorder, alcohol, and polysubstance dependency in early full remission, anxiety, and attention deficit hyperactive disorder. Dr. Deutsch opined that Spruel "would need a year of solid recovery

from today on, including the development of better coping mechanisms, to be able to safely parent a child who does not have special needs." In his opinion, Spruel's "fragile stability and ongoing psychological needs as well as poor coping mechanisms would put any child in her care at risk."

On January 25, 2013, the Department filed a petition seeking termination of Spruel's parental rights as to A.N.S.

On April 17, 2013, one month before the scheduled termination trial and 14 months after Spruel's visits had been suspended, the juvenile court denied Spruel's motion to reinstate visitation with A.N.S. Just over one week prior to the hearing, Perbix Mallos opined that A.N.S. had stabilized from her early trauma and that the disruption that would be caused by a visit with Spruel would throw the child back into "trauma from which her recovery is not guaranteed." Perbix Mallos believed that Spruel was a stranger to A.N.S. and that imposing a relationship on them would cause emotional and psychological damage to A.N.S. The juvenile court agreed with Perbix Mallos, finding that the "mother's behavior created a situation where [A.N.S.] is afraid of her mother." The court further found that it was not in A.N.S.'s best interests for visits to be reinstated. The court again ordered Spruel to make progress in her mental health treatment before visits could be reinstated.

On June 26, 2013, the termination trial commenced. At the time of trial, Spruel was living in a homeless shelter. She had been clean for four and a half months, but still had unresolved criminal issues and was on probation for assault. A.N.S. had been out of her custody for 20 months.

- 8 -

At trial, Spruel testified to past difficulty with methamphetamine, heroin, and alcohol use, including use at an early age. Chemical dependency counselor John-Paul Sharp testified that Spruel had been diagnosed with heroin dependency and alcohol and methamphetamine abuse. Although Sharp observed areas of progress, he explained that Spruel's earliest graduation date would be in March 2014. Cavanagh testified that Spruel needed to demonstrate one year of sobriety before she could parent A.N.S. Cavanagh believed that one year fell outside the foreseeable future for A.N.S.

Testimony was received regarding Spruel's history of abuse, trauma, and mental illness. Spruel related a history of unhealthy relationships, which included substance abuse and domestic violence. She testified to experiencing drug-induced hallucinations, auditory hallucinations, and hospitalizations for mental health breakdowns. She stated that she continued to hear voices after her stay at Harborview and that she had heard voices as recently as a few months before trial. She also testified that she was molested as a child by her biological father and later by a step-father. She suffered depression throughout her life and attempted suicide at age 14.

Much of the information about Spruel's trauma was disclosed for the first time during trial. Although her counselor and mental health therapist, Carol Sherwood, explained that Spruel was willing and cooperative in addressing her mental health problems, she also testified that Spruel had not disclosed to her a history of unhealthy relationships or molestation issues. Sherwood

acknowledged that they were just beginning to "unravel" the threads that were Spruel's problems.

Dr. Deutsch testified and reiterated his conclusion that Spruel would need "a long time to achieve consistent emotional stability" and "at least a year of solid recovery to handle a . . . normal child." He testified that even with support from the Department, continued engagement in mental health and drug treatment, and a counselor in the home, a child would still be at risk in Spruel's care if returned before Spruel engaged in all the recommended treatment for at least one year.

Emma Hoagland, who taught Spruel's parenting class, testified that Spruel was making progress in the class. Spruel testified that she did not believe that she had any parenting problems. However, she admitted that she would need time to obtain housing, schooling, and to be emotionally prepared to parent A.N.S.—she estimated she would need six months. Spruel also admitted that she would not be able to care for A.N.S. independently until Spruel completed her education and started her career.

Perbix Mallos, A.N.S.'s therapist, testified that, despite her earlier diagnosis of trauma and posttraumatic distress syndrome, at the time of trial, A.N.S. was doing "great" and was now socially and emotionally progressing. She testified that A.N.S.'s current placement was a secure, predictable, and nurturing environment, which was vital for a child who had experienced trauma and loss.

On June 28, 2013, the trial court granted the Department's petition to terminate Spruel's parental rights as to A.N.S.

Spruel appeals.

II

On appeal, Spruel contends that the State failed to prove by clear, cogent, and convincing evidence that all necessary services "capable of correcting the parental deficiencies within the foreseeable future" were provided to her. The necessary services withheld, Spruel avers, were therapeutic parenting skill services to correct A.N.S.'s behavioral issues, which were nevertheless provided to the foster parents. We disagree.

"Parents have a fundamental right to the care and custody of their children, and a trial court asked to interfere with that right should employ great care." In re Welfare of M.R.H., 145 Wn. App. 10, 23, 188 P.3d 510 (2008). "[T]ermination of parental rights should be allowed 'only for the most powerful [of] reasons.'" In re Welfare of S.J., 162 Wn. App. 873, 880, 256 P.3d 470 (2011) (alteration in original) (internal quotation marks omitted) (quoting In re Welfare of A.J.R., 78 Wn. App. 222, 229, 896 P.2d 1298 (1995)).

To terminate parental rights, the Department must satisfy a two-step test. RCW 13.34.180(1),.190; In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). First, the Department must prove, by clear, cogent, and convincing evidence, the six termination factors enumerated in RCW 13.34.180(1).[1] In re

[1] The six termination factors are:
    (a) That the child has been found to be a dependent child;
    (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
    (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
    (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services,

Dependency of K.N.J., 171 Wn.2d 568, 576-78, 257 P.3d 522 (2011). One such factor requires the Department to prove that "the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." RCW 13.34.180(1)(d). These services "must be tailored to each individual's needs." In re Dependency of T.R., 108 Wn. App. 149, 161, 29 P.3d 1275 (2001). "Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown by the evidence to be 'highly probable.'" In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995) (internal quotation marks omitted) (quoting In re Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). The second step focuses on the child's best interests and is reached only if the first step is satisfied. A.B., 168 Wn.2d at 911.

Where the trial court has weighed the evidence, our review is limited to determining whether the court's findings of fact are supported by substantial

---

reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. The presumption shall not arise unless the petitioner makes a showing that all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future have been clearly offered or provided.

. . .

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. . . .

RCW 13.34.180(1).

evidence and whether those findings support the court's conclusions of law. In re Dependency of P.D., 58 Wn. App. 18, 25, 792 P.2d 159 (1990). "'Substantial evidence' is evidence in sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." In re Welfare of T.B., 150 Wn. App. 599, 607, 209 P.3d 497 (2009). The determination of whether the findings of fact are supported by substantial evidence "must be made in light of the degree of proof required." P.D., 58 Wn. App. at 25. Where, as here, the proof required is clear and convincing, "the question on appeal is whether there is substantial evidence to support the findings in light of the highly probable test." P.D., 58 Wn. App. at 25.

The trial court made several findings of fact pertinent to Spruel's claim of error. First, the court found that A.N.S.'s needs exceeded those of a normal child and that she required therapeutic parenting skills. Second, the court found that "[t]herapeutic parenting skills would not be available to the mother because she was not allowed visitation with the child pursuant to court order finding that she was a risk to her child." These findings are supported by substantial evidence in the record and conclusively establish that therapeutic parenting skills training was not a remedial service that was "reasonably available" to Spruel.

A.N.S.'s therapist, Perbix Mallos, diagnosed A.N.S. with anxiety, posttraumatic stress disorder, aggression, and reduced emotional reactivity. She opined that A.N.S. was under stress and was traumatized, and that she needed stability and permanency. Her diagnosis and subsequent testimony constitute substantial evidence supporting the trial court's finding that A.N.S.'s needs

exceeded those of a normal child and that she required therapeutic parenting skills.

Furthermore, Perbix Mallos testified that therapeutic parenting skills cannot be learned when lacking contact with the child:

> [W]e have to work on it with the child present. We have to be able to note what the child is doing, and we have to be able to build trust in the relationship.
> There has to be some sort of relationship basis for therapeutic parenting to work, or any kind of parenting.

Considering that Spruel's visitation rights with A.N.S. had been suspended for well over a year, Perbix Mallos's testimony presents substantial evidence supporting the trial court's finding that therapeutic parenting skills were not available to the mother.

Nevertheless, Spruel argues that she "was also denied the opportunity to review available therapeutic parenting reading material to find out what techniques were being used successfully in the foster home." This argument is rebutted by Perbix Mallos's testimony: "So you can read this book and understand what we're talking about, but applying it to your specific child means we have to integrate a specific technique into the treatment plan." Because Spruel was not permitted to have contact with A.N.S., even if Spruel had familiarized herself with the pertinent literature the fact remained that therapeutic parenting skills—which, by definition, require an interactive component—were not available to her.

Spruel's efforts to analogize to In re Welfare of C.S., 168 Wn.2d 51, 225

P.3d 953 (2010), are unavailing. In C.S., although the mother successfully addressed her substance abuse, the trial court nonetheless terminated her parental rights based on her alleged inability to address her child's special needs. C.S., 168 Wn.2d at 55. However, because the Department provided the child's foster parents with training "deemed necessary" to effectively deal with the child's special needs without ever offering the mother the same training, our Supreme Court reversed. C.S., 168 Wn.2d at 55-56.

In contrast to the facts in C.S., here, the services at issue were unavailable to Spruel not because the Department neglected to provide them, but because Spruel was unable or unwilling to fulfill the requirements necessary to regain her visitation rights—a precondition for the Department to be able to offer the services. The Department offered all necessary services. The trial court did not err.

III

Spruel next contends that the trial court improperly found little likelihood that conditions would be remedied so that A.N.S. could be returned to Spruel in the near future. This is so, Spruel avers, because at the time of the termination trial, she was improving. She argues that this improvement rebutted the statutory presumption contained within RCW 13.34.180(1)(e). We disagree.

One of the six statutory factors that the State must prove prior to terminating parental rights requires the trial court to determine that "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.34.180(1)(e). The focus of this factor is

"whether the identified [parental] deficiencies have been corrected." M.R.H., 145 Wn. App. at 27. What constitutes the "near future" depends upon the age of the child who is the subject of the termination proceedings; "[a] matter of months for young children is not within the foreseeable future to determine if there is sufficient time for a parent to remedy his or her parental deficiency." M.R.H., 145 Wn. App. at 28.

"A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.34.180(1)(e). However, this presumption arises only where the State demonstrates "that all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future have been clearly offered or provided." RCW 13.34.180(1)(e). The statute provides that "[i]n determining whether the conditions will be remedied the court may consider, but is not limited to," three statutory factors. RCW 13.34.180(1)(e). These factors are as follows:

> (i) Use of intoxicating or controlled substances so as to render the parent incapable of providing proper care for the child for extended periods of time or for periods of time that present a risk of imminent harm to the child, and documented unwillingness of the parent to receive and complete treatment or documented multiple failed treatment attempts;
> (ii) Psychological incapacity or mental deficiency of the parent that is so severe and chronic as to render the parent incapable of providing proper care for the child for extended periods of time or for periods of time that present a risk of imminent harm to the child, and documented unwillingness of the parent to receive and complete treatment or documentation that there is no treatment that can render the parent capable of providing proper care for the

child in the near future; or

(iii) Failure of the parent to have contact with the child for an extended period of time after the filing of the dependency petition if the parent was provided an opportunity to have a relationship with the child by the department or the court and received documented notice of the potential consequences of this failure, except that the actual inability of a parent to have visitation with the child including, but not limited to, mitigating circumstances such as a parent's current or prior incarceration or service in the military does not in and of itself constitute failure to have contact with the child.

RCW 13.34.180(1)(e).

As an initial matter, it is evident that the presumption applies. The Department removed A.N.S. on October 11, 2011 and A.N.S. was declared dependent on December 6. More than one year had passed when the Department filed its termination petition in January 2013. Additionally, all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future were clearly offered or provided. Moreover, an examination of the three factors reveals that Spruel cannot rebut the presumption.

Spruel has a lengthy history of substance abuse and of refusing to receive or complete treatment for this abuse. As cataloged in the recitation of the facts, Spruel either refused to attend treatment programs or began treatment but left before finishing. This happened many times. At the hearing, Cavanagh testified that Spruel would need to maintain a year of sobriety before she would be ready to parent. She went on to say that, "a year to a four-year-old is a quarter of her life at this point. That's way beyond the scope of that child's understanding." Although Spruel had shown signs of improvement, not the least of which was

- 17 -

maintaining sobriety for around five months, Spruel had not completed the necessary services and had a well-documented history of either not participating at all, or starting but failing to finish.

Spruel also has a well-documented history of mental health issues. At the time of the hearing, she had just begun mental health counseling in February 2013. In addition to missing 25 percent of these appointments, Spruel had previously refused to complete a psychological evaluation and had refused to avail herself of dual diagnosis treatment to which she was referred. Cavanagh testified that she "can't even begin to estimate" the length of time it would take for Spruel to gain stability in her mental health and that "[a]fter years of the experiences that she had, I don't know how long it would take to resolve those for her to the point that she could safely parent." Moreover, Sherwood testified that they were just beginning to "unravel" the threads that were Spruel's problems. This evidence indicates that Spruel's mental health issues will not be remedied in the near future.

Spruel also failed to have contact with A.N.S. for over a year after the filing of the dependency petition. Spruel initially had visitation rights, but her rights were revoked after she engaged in destructive behavior. Although Spruel could have regained her visitation rights, she was unable or unwilling to fulfill the requirements necessary to regain these rights. As a result, she was barred from visiting A.N.S. for over one year.

Examination of the three statutory factors that inform the inquiry pursuant to RCW 13.34.180(1)(e) reveals that Spruel has failed to rebut the presumption

that there is little likelihood that conditions will be remedied so that A.N.S. can be returned to Spruel in the near future. Indeed, all three factors militate against Spruel's position on appeal.

At the time of trial, A.N.S. had been in and out of home care for 20 months; nearly half of her life had been spent in foster care. Although Spruel had shown signs of improvement and had begun to engage in services necessary to remedy her parental deficiencies, as well as maintaining sobriety for around five months, she had not completed the necessary services and had a well-documented history of either not participating at all, or starting but failing to finish. This inconsistency also presents itself in the context of her mental health issues. Finally, Spruel demonstrated no willingness to takes steps necessary to regain visitation rights prior to filing of the termination petition. Both Cavanagh and Dr. Deutsch testified that it would be at least one year before Spruel would be fit to parent A.N.S. In light of A.N.S.'s imminent need for a stable and safe environment, the trial court's finding that there was little likelihood that conditions would be remedied so that A.N.S. could be returned to Spruel in the near future is supported by substantial evidence.[2]

---

[2] Although Spruel contends that the trial court erred in finding that termination was in the child's best interests, her contention is not that insufficient evidence was presented to support the trial court's conclusion that termination was in the best interests of A.N.S., but rather that the trial court never should have reached the issue of A.N.S.'s best interests. Given our contrary conclusion, nothing remains for us to review.

Affirmed.

We concur: