2015 SEP 21   10: 55



# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of<br>C.F.R.,<br>(B.D. 02/13/2009);<br>D.J.R.,<br>(B.D. 03/11/2007);<br>D.J.R.,<br>(B.D. 01/07/2010);<br><br>            Minor Children.<br><br>STATE OF WASHINGTON,<br>DEPARTMENT OF SOCIAL AND<br>HEALTH SERVICES,<br><br>            Respondent,<br><br>            v.<br><br>DONALD RAYFIELD,<br><br>            Appellant. | No. 72441-0-I (consolidated with<br>case Nos. 72443-6-I and 72442-8-I)<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br><br><br><br><br><br><br><br><br><br>FILED: September 21, 2015 |

TRICKEY, J. — Donald Rayfield appeals the termination of his parental rights to his three children. He claims the trial court violated his right to due process by terminating his rights based on a parental deficiency of which he did not receive adequate notice before the fact-finding hearing. He also challenges several of the trial court's findings of fact. But he fails to demonstrate a due process violation. And substantial evidence in the record supports the court's findings, which in turn, support the court's legal conclusions. We affirm.

## FACTS

Donald Rayfield is the father of D.J.R. (born 3/11/2007), C.F.R. (born 2/13/2009), and D.J.R. (born 1/7/2010). The children's mother, Haley Johnson, is not a party to this proceeding.[1]

The Department of Social and Health Services (Department) first became involved after the death of 10-month-old E.R. (born 4/7/2008) in the family home in March 2009. E.R. was found wrapped in a blanket in a hot room. The family home was "unsafe, unsanitary, and unclean."[2] The Department removed D.J.R. and C.F.R. from the home during dependency proceedings from May 2009 until February 2010.[3] Rayfield completed parenting classes and a parenting assessment as ordered during the dependency, which was dismissed in September 2010. The Department remained involved with the family until the dismissal of a dependency as to Johnson's older daughter, H.M.T.-U., in May 2011.

In June 2011, Rayfield and Johnson's six-month-old daughter S.R. (born 11/30/2010) died unexpectedly. S.R. was found wrapped in a blanket in a room with a thermostat turned to at least 90 degrees. The family home was again "unsafe, unsanitary, and unclean."[4] The Department filed a dependency petition and removed D.J.R., C.F.R., and D.J.R. from their parents' care. The Department placed the children with their maternal grandmother, Bonnie Rivers, early in July 2011.

---

[1] The trial court terminated Johnson's parental rights by default on July 22, 2014.
[2] Clerk's Papers (CP) at 15.
[3] The younger D.J.R. was born during the first dependency.
[4] CP at 16.

On October 12, 2011, the court entered an order of dependency for all three children as to Rayfield. The court ordered Rayfield to participate in parenting classes and individual counseling. The court also ordered a minimum of two hours per week of supervised visitation as arranged with the Department.

Early in November 2011, Rayfield moved to Minnesota without notifying the Department or providing any contact information. Rayfield did not contact the Department or appear at regularly scheduled dependency review hearings for over a year. In December 2012, George Nelson, the social worker assigned to the case, found an address in Minnesota for Rayfield through the Department's Division of Child Support and sent him a certified letter. Rayfield responded by e-mail, indicating that he had believed the children were with Johnson, requesting information, and expressing an intention to visit the children in Washington.

Nelson supervised a visit between Rayfield and the three children on January 17, 2013. Rayfield next contacted Nelson on March 4, 2013, to inquire about ordered services, which by this time included parenting classes, individual counseling, a domestic violence assessment, and a psychological evaluation.

The Department filed a petition to terminate Rayfield's parental rights on March 26, 2013, alleging: "The parental deficiencies of the father include alleged domestic violence, neglect, lack of parenting ability, and abandonment of the child."[5]

Rayfield returned to Washington in April 2013 for over a week, but his and Nelson's efforts to schedule a visit failed. Rayfield appeared at a hearing on May

[5] CP at 124, 126.

29, 2013, and requested review of ordered services and visitation. The court removed the domestic violence assessment but affirmed the previous order requiring parenting classes, individual counseling, and a psychological evaluation. The court ordered Rayfield to work with the Department "to establish a consistent, regular schedule for in-person visits in Washington."[6] The court also authorized "Skype and/or telephone visits" "two times a week at a mutually agreed upon time."[7]

In June and early July 2013, Rayfield participated in a psychological evaluation by Dr. Kenneth Asher. The evaluation included an observed one-hour play session with the oldest child, D.J.R.

The court held a fact-finding hearing in June 2014. Rayfield testified that he was no longer living with Johnson by the time S.R. died, but he visited the children often and did not notice unsanitary conditions. He described Johnson as a "compulsive . . . liar" and admitted that he suspected that she was abusing prescription medication.[8] Rayfield testified that he moved to Minnesota in November 2011 to develop a relationship with the woman he later married. He explained that he did not stay in Washington to resolve the dependency because Johnson told him "she would be able to get the kids."[9] He testified that Johnson called him when he was in Minnesota and told him that she had the children

---

[6] Exhibit (Ex.) 12 at 3.
[7] Ex. 12 at 3.
[8] Report of Proceedings (RP) (June 16, 2014) at 24, 32.
[9] RP (June 16, 2014) at 40.

living with her, sent him "a picture of the kids in a house," and let him "talk to the kids maybe once."[10]

Rayfield testified that since moving to Minnesota, he married and began co-parenting two stepdaughters, and he was employed and attending community college. He claimed that Nelson and Rivers prevented him from visiting the children as much as he wished between April 2013 and the fact-finding hearing in June 2014. Rayfield testified that he believed that Rivers would not have allowed him to call the children at unscheduled times. He also believed that Rivers would not accept gifts for the children because she once told him that they did not need anything special and D.J.R. told him at the July 2013 evaluation that "his nana [told him] not to take anything from [Rayfield]."[11]

Nelson testified that he had difficulty arranging visits between Rayfield and the children in early April 2013 because of scheduling conflicts, as well as Rayfield's inconsistent communication and transportation issues. Rayfield sent an e-mail expressing his frustration on April 8 or 9, 2013. When Nelson approached Rayfield at the May 29, 2013 hearing to discuss arranging visits, Rayfield told Nelson that he would not speak to him without his attorney present. In an e-mail exchange in late June 2013, Rayfield blamed Nelson for his lack of visits with his children and complained about the lack of timely arrangements for the transportation of D.J.R. to the psychological evaluation. Otherwise, between April 2013 and the June 2014 fact-finding hearing, Rayfield did not ask Nelson to

---

[10] RP (June 16, 2014) at 40.
[11] RP (June 16, 2014) at 118.

arrange visits with the children and did not respond to his efforts to obtain a professional visit supervisor or qualify relatives to supervise visits.

Nelson also testified that in March 2013, Rayfield indicated by e-mail that he did not intend to participate in the services ordered by the dependency court because he believed they were unnecessary and a waste of time. However, a few days later, Rayfield agreed to participate in a psychological evaluation. On a conference call in December 2013, when Nelson asked about the remaining ordered services of parenting classes and individual counseling, Rayfield indicated "that he had no intention of doing any services whatsoever."[12]

Rivers testified that Rayfield visited the children "a couple" of times "initially in the beginning" between July and November 2011.[13] She then heard nothing from Rayfield until June 2013, when he agreed to call the children once each week, on Sunday evenings at 7:00. Rivers testified that Rayfield's calls were consistent at first, but less so in the three months before the hearing, with "about 75 percent" of calls occurring as agreed.[14] Rivers testified that Rayfield never called the children on birthdays or holidays, never sent gifts or cards, and never called her to inquire about their health or well-being. Rivers testified that she would have allowed the children to talk to Rayfield if he had called at other times, that she told the children to call him "[D]ad," and that she never told the children not to accept gifts from him.[15]

---

[12] RP (June 19, 2014) at 158-59.
[13] RP (June 17, 2014) at 118.
[14] RP (June 17, 2014) at 121-22.
[15] RP (June 17, 2014) at 124-26.

Following the hearing, the court terminated Rayfield's parental rights. The court repeatedly stated, both in its oral ruling and in extensive written findings of fact, that Rayfield's testimony lacked credibility in several respects. The court found that Rayfield "essentially abandoned his children" for over a year and then took only "minimal action to reestablish a relationship with them."[16] Given what he knew of Johnson, the court determined that Rayfield's claim that he believed "the children were fine" with Johnson was "not reasonable or credible" and was "not the action of a fit parent."[17] The court found Rayfield "has no understanding or recognition that his actions have been harmful to his children," has demonstrated an "unwillingness to participate in remedial services," and that his "continued lack of insight, denial of responsibility, and externalization of blame indicates that nothing will change in the near or foreseeable future."[18]

Rayfield appeals.

## ANALYSIS

Parents have a fundamental liberty interest in the care and welfare of their children. In re Dependency of Schermer, 161 Wn.2d 927, 941-42, 169 P.3d 452 (2007). Parental rights cannot be abridged without due process of law. In re Dependency of A.M.M., 182 Wn. App. 776, 790-91, 332 P.3d 500 (2014). Due process requires "'that parents receive notice of the specific issues to be considered'" at a termination hearing. A.M.M., 182 Wn. App. at 791 (quoting In re Welfare of Martin, 3 Wn. App. 405, 410, 476 P.2d 134 (1970)). Such notice is

---

[16] CP at 17, 20.
[17] CP at 20.
[18] CP at 20.

required "'to prevent surprise, helplessness and disadvantage.'" A.M.M., 182 Wn. App. at 791 (quoting Martin, 3 Wn. App. at 410).

To terminate parental rights, the Department must satisfy a two-pronged test. In re Dependency of K.N.J., 171 Wn.2d 568, 576, 257 P.3d 522 (2011). The Department must first prove the statutory elements set forth in RCW 13.34.180(1)(a) through (f)[19] by clear, cogent, and convincing evidence. K.N.J., 171 Wn.2d at 576-77.

Evidence is clear, cogent, and convincing if it established the ultimate fact in issue as "'highly probable.'" In re Dependency of K.R., 128 Wn.2d 129, 141,

---

[19] RCW 13.34.180(1) states, in pertinent part:

A petition seeking termination of a parent and child relationship may be filed in juvenile court by any party, including the supervising agency, to the dependency proceedings concerning that child. Such petition shall conform to the requirements of RCW 13.34.040, shall be served upon the parties as provided in RCW 13.34.070(8), and shall allege all of the following unless subsection (3) or (4) of this section applies:

(a) That the child has been found to be a dependent child;

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . . ;

. . . ; and

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. If the parent is incarcerated, the court shall consider whether a parent maintains a meaningful role in his or her child's life based on factors identified in RCW 13.34.145(5)(b); whether the department or supervising agency made reasonable efforts as defined in this chapter; and whether particular barriers existed as described in RCW 13.34.145(5)(b) including, but not limited to, delays or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child.

904 P.2d 1132 (1995) (internal quotation marks omitted) (quoting In re Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). If the trial court finds that the Department has met its burden under RCW 13.34.180, it may terminate parental rights if it also finds by a preponderance of the evidence that termination is in the "best interest" of the child. K.N.J., 171 Wn.2d at 577.

Where the trial court has weighed the evidence, our review is limited to determining whether the court's findings of fact are supported by substantial evidence and whether those findings support the court's conclusions of law. In re Dependency of P.D., 58 Wn. App. 18, 25, 792 P.2d 159 (1990). "'Substantial evidence' is evidence in sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." In re Welfare of T.B., 150 Wn. App. 599, 607, 209 P.3d 497 (2009) (quoting World Wide Video, Inc. v. City of Tukwila, 117 Wn.2d 382, 387, 816 P.2d 18 (1991)). The determination of whether the findings of fact are supported by substantial evidence "must be made in light of the degree of proof required." P.D., 58 Wn. App. at 25. In determining whether substantial evidence supports the trial court's findings, this court does not weigh the evidence or the credibility of witnesses. In re Dependency of E.L.F., 117 Wn. App. 241, 245, 70 P.3d 163 (2003).

*Due Process*

Relying on A.M.M., Rayfield first contends that the trial court violated his right to due process by terminating his parental rights based on parental deficiencies of which he did not receive adequate notice before the fact-finding hearing. In A.M.M., the dependency proceedings and the termination hearing

focused on the mother's substance abuse problems. A.M.M., 182 Wn. App. at 780-83. But the trial court terminated her parental rights based on a separate parental deficiency, in addition to substance abuse, that was not stated in the termination petition or dependency petition and of which she was not informed before trial. A.M.M., 182 Wn. App. at 792. This court reversed and remanded for the trial court to determine whether termination was appropriate on the basis of the parental deficiencies of which the mother was given adequate notice, specifically, her substance abuse and lack of availability and follow through. A.M.M., 182 Wn. App. at 792-93.

Here, Rayfield argues that the following findings demonstrate a violation of his due process rights:

> 2.47 The father's parental deficiencies include the inability to safely parent because he lacks the cognitive ability and the emotional and/or psychological skills and ability to keep his children safe and to meet their needs.

> 2.48 The father's parental deficiencies include a lack of insight into his children's needs and an inability to act in their interest. The father lacks insight into his own issues, is in denial that he has any parenting problems, and refuses to accept any responsibility for his own actions or the circumstances of his children.[20]

Rayfield contends he was not notified prior to the hearing that his lack of "insight" and "cognitive ability" to "safely parent" his children constituted a parental deficiency upon which termination could be based. His reliance on A.M.M. is misplaced. The Department alleged in its petition for termination that Rayfield's parental deficiencies included "neglect, lack of parenting ability, and abandonment" of the children. The dependency proceedings and termination

---

[20] CP at 17-18.

hearing focused on Rayfield's knowledge of the children's living conditions, his failure to protect them from known hazards, his failure to maintain contact or relationships with them, and his participation in the proceedings and remedial services. The trial court's findings describing the reasons for his lack of parenting ability and neglect and abandonment of his children do not identify an additional parental deficiency of which he was not properly informed before the termination hearing. Rayfield fails to establish a due process violation.

*Current Unfitness and Little Likelihood that Conditions Would be Remedied*

Rayfield next challenges the evidentiary basis for the trial court's determinations that he was currently unfit to parent his children and that there was little likelihood that conditions would be remedied so that his children could be returned to him in the near future.

The Department must prove that the parent is currently unfit and "[t]hat there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.34.180(1)(e); In re Welfare of A.B., 168 Wn.2d 908, 921, 232 P.3d 1104 (2010). "To meet its burden to prove current unfitness in a termination proceeding, [the Department] is required to prove that the parent's parenting deficiencies prevent the parent from providing the child with 'basic nurture, health, or safety' by clear, cogent, and convincing evidence." In re Welfare of A.B., 181 Wn. App. 45, 61, 323 P.3d 1062 (2014) (quoting RCW 13.34.020).

Rayfield contends that the evidence did not support a finding of current unfitness because he was living a stable life and successfully co-parenting his

stepchildren in Minnesota, he had completed a parenting class in the first dependency, and he had no substance abuse issues or mental disorders. He also relies on Dr. Asher's positive report and recommendation for reunification to argue that the Department failed to prove any current deficiency in his ability to parent. Finally, he claims the trial court failed to recognize that his actions after December 2012, specifically, his active participation in the case, his efforts to visit the children, and his love for the children, prevent a finding of current unfitness based on abandonment or neglect.

During the dependency proceedings, the court ordered Rayfield to participate in parenting classes, individual counseling, and a psychological evaluation. The court also ordered him to establish regular, consistent in-person visits with the children, as well as twice weekly Skype or telephone contact while he was out of state.

By the time of the termination hearing, Rayfield had completed only the psychological evaluation. He had visited all three children once, and one child twice, over the two and a half years before the hearing. Over the last year before the hearing, he called the children only once weekly, but less in the three months before the hearing. Although Dr. Asher did not recommend parenting classes or individual counseling, Nelson testified that he believed such services were necessary given Rayfield's failure to acknowledge and address the circumstances surrounding the two deaths as well his abandonment of the children and his failure to establish a relationship with them. Nelson characterized Rayfield's participation in the dependency since December 2012

as "minimal compliance," marked by "[u]nwillingness to work with professionals" or "cooperate with fairly benign requests," and focused on his own frustrations rather than "the best interest[s] of his kids."[21] The guardian ad litem testified that Rayfield had "estranged himself" from the children by his extended absence from their lives.[22] Substantial evidence supports the trial court's findings that despite the offering of services, Rayfield failed to improve his ability "to recognize situations or circumstances that are harmful to his children"[23] or to maintain or rebuild his relationships with his children while being apart from them for nearly three years. His failure to correct his deficiencies prevented him from being able to adequately parent his children. The trial court did not err in finding that Rayfield was currently unfit to parent his children.

The trial court also properly found that there was little likelihood that conditions would be remedied in the near future. The focus of RCW 13.34.180(1)(e) is whether the identified deficiencies have been corrected. See In re Welfare of M.R.H., 145 Wn. App. 10, 27, 188 P.3d 510 (2008). "Even where there is evidence that the parent may eventually be capable of correcting parental deficiencies, termination is still appropriate where deficiencies will not be corrected within the foreseeable future." In re Welfare of A.G., 155 Wn. App. 578, 590, 229 P.3d 935 (2010). Although the law provides no numerical standard to measure the foreseeable future, this determination is a factual inquiry evaluated from "the child's point of view," which varies with the child's age. In re Dependency of A.C., 123 Wn. App. 244, 249, 98 P.3d 89 (2004) (citing In re

---

[21] RP (June 18, 2014) at 55.
[22] RP (June 17, 2014) at 92-93.
[23] CP at 20.

Welfare of Hall, 99 Wn.2d 842, 851, 664 P.2d 1245 (1983)); see, e.g., In re Dependency of T.R., 108 Wn. App. 149, 165-66, 29 P.3d 1275 (2001) (one year is not foreseeable or near future for six-year-old child); Hall, 99 Wn.2d at 850-51 (eight months is not within the foreseeable future of four-year-old child); In re Dependency of A.W., 53 Wn. App. 22, 32, 765 P.2d 307 (1988) (one year is not in the near future of three-year-old child); P.D., 58 Wn. App. at 27 (six months is not in the near future of 15-month-old child).

The guardian ad litem testified that although Rayfield had matured in some respects over the course of the dependency, he still was "not able to see things through the eyes of [his] children" or understand situations that put them at risk.[24] Nelson testified that even if Rayfield engaged in services and made progress toward addressing his deficiencies, he would not recommend placing the children with Rayfield before the completion of the process under the Interstate Compact for the Placement of Children, which would take between six and twelve months. Given the age and experiences of the children, Nelson testified that their near future was three to six months. Substantial evidence supported the trial court's findings that there was little likelihood that Rayfield would correct his parental deficiencies in the near future.

*Challenges to the Findings of Fact*

Finally, Rayfield has assigned error to approximately fifty of the trial court's findings of fact. The majority of the claims of error invite this court to reweigh the evidence, independently determine the credibility of the witnesses, or substitute

---

[24] RP (June 17, 2014) at 90.

our judgment for that of the trial court.[25] And several claims involve details that are not critical to the court's legal conclusions as to the relevant statutory elements.[26] Because Rayfield fails to identify or establish reversible error in the trial court's findings of fact, and because, as discussed above, substantial evidence supports the findings that, in turn, support the court's legal conclusions, we need not address each challenge individually.

Affirmed.

_Trickey, J_

WE CONCUR:

_Dwyer, J_            _Cox, J._

---

[25] For instance, Rayfield challenges the court's finding that his claimed belief that the children would be fine with Johnson was unreasonable, arguing that his belief was reasonable because the Department returned the children to Johnson's care after the first dependency.

[26] For example, in his challenge to the court's finding that he "insisted on raising chickens" and that "chicken feces were observed on the floor where the baby [crawled]," Rayfield argues that Rivers did not testify that he "insisted" on the chickens or that she "specifically" observed feces where C.F.R. crawled. CP at 16.