[Nos. 27659-7-III; 27660-1-III.   Division Three.   April 20, 2010.]

*In the Matter of the Welfare of* A.G. ET AL.

---

*David L. Donnan* (of *Washington Appellate Project*) and
*Heather L. McKimmie* (of *Disability Rights Washington*), for
appellant.

*Robert M. McKenna, Attorney General,* and *Tobin J.
Carlson, Assistant,* for respondent.

¶1 Sweeney, J. — This appeal follows the termination of
a mother's legal parental rights to two of her three minor
children. Like all parental termination cases, it is emotion-
ally difficult for the parties, the lawyers, and the court. The
essential challenge by the mother is that she had started to
do what was necessary to change her life and put herself in
a position to appropriately parent her children. As with
many of these cases, the question is whether her efforts fall
under the category of "too little too late." The trial judge
concluded that her efforts were "too little too late." That is,
at its heart, a factual question. And we conclude, as a

matter of law, that it is a factual determination supported by this record. We therefore affirm the decision of the trial judge.

## FACTS

¶2 April G. is the mother of A.G. and L.S. A.G. was born on December 7, 2001. And L.S. was born on January 20, 2005. A.G. and L.S. were removed from Ms. G.'s custody in June 2005. They have remained in foster care since that time. The court declared A.G. and L.S. dependent children in August 2005.

¶3 Ms. G. also has a son, M.S., born on October 17, 2006. At the time of the trial that is the subject of this appeal, M.S. was in Ms. G.'s care. M.S. has never lived with A.G. or L.S.

¶4 In March 2007, the State petitioned to terminate Ms. G.'s parental rights as to A.G. and L.S. because of drug and alcohol abuse, neglect of the children, domestic violence, and serious mental health problems. The case proceeded to hearing in late summer and fall of 2008. The State presented testimony from a variety of counselors, all of whom had worked with Ms. G. over the course of recent years. Those witnesses included a national-board-certified mental health counselor who was also a Washington-state-certified perpetrator treatment program supervisor, a domestic violence counselor, and drug and alcohol counselors.

### DRUGS AND ALCOHOL

¶5 Ms. G. was diagnosed as being dependent on marijuana in 2006. She made limited progress in some programs (Pend Oreille County Counseling) but did better in others (Perinatal Treatment Services, Transitional Living Center, and New Horizons). Ms. G. used methamphetamine in September 2006 and was positive for THC (tetrahydrocannabinol (marijuana)) six times from March to September 2006. She provided a total of 100 UA (urinalysis) samples from 2005 to July 31, 2008. They were all negative

except for the six THC, one methamphetamine, and two additional low creatinine readings. Ms. G. has had no positive UA results since leaving the Transitional Living Center program in January 2008. Her last positive UA was September 10, 2006. But she has provided several diluted samples and did not show up to give a sample a number of times.

DOMESTIC VIOLENCE ANGER MANAGEMENT

¶6 Ms. G. received treatment for anger control in two settings. First, she received 60 hours of anger management counseling while in a program called Perinatal Treatment Services. Second, she had ongoing family support and parenting group sessions while at Transitional Living Center. However, professionals concluded that Ms. G. needed a domestic violence perpetrator program. Ms. G. refused to participate in the program at first, but at the time of trial she had enrolled in the one-year perpetrator program.

MENTAL HEALTH

¶7 Ms. G. underwent an intake interview at Pend Oreille County Counseling with a behavioral health counselor in September 2005. However, she did not complete the intake after the counselor refused to provide proof that Ms. G. was in counseling. Ms. G. completed an intake interview with a mental health therapist in June 2007, but she did not start counseling as scheduled. She reported having visual and auditory hallucinations since childhood and reported that she was always being watched. She had auditory and visual hallucinations as recently as late 2007 and early 2008. Ms. G. reported seeing spirits of children, which had been in an orphanage, and again she reported that people were always watching her. She had seen spirits throughout her life. And the hallucinations were prior to and independent from any chemical dependency.

¶8 A counselor met with Ms. G. one time in June 2007. She intended to have weekly sessions with Ms. G., but Ms. G. did not show up for her next scheduled appointment. The

counselor did not have enough information to diagnose Ms. G. And the counselor could not conclude that the hallucinations and paranoia affected Ms. G.'s daily living. The hallucinations were not a threat "to harm self or others." Report of Proceedings (RP) at 708.

ATTACHMENT TO CHILDREN

¶9 A.G. and L.S. had been out of Ms. G.'s home for 13 months by mid-2006. A social worker conducted a parent-child bonding and attachment assessment. She drew a number of conclusions.

¶10 A.G. had a significant social and emotional attachment with her mother. She looked to her mother as a source of comfort and security. A.G.'s attachment to Ms. G. was described as anxious "in terms of her mother's availability." RP at 275. "[A.G.] didn't trust that her mother was going to be there for her or that she would have access to her mother." *Id.* The anxiety was likely due to living apart, not due to their relationship before A.G. and L.S. were removed. The bond between A.G. and her mother had been weakened by their separation.

¶11 L.S. had a social relationship with her mother but no attachment had formed. L.S. had no anxiety on separation from her mother. Eight hours of visitation a week with L.S. is not enough time to develop an attachment or bond with her mother.

¶12 One mental health counselor has worked with A.G. since February 2007 and L.S. since August 2007. She concluded that A.G.'s behaviors deteriorated in the fall of 2007. A.G.'s behavior was "far more escalated and severe" when she was having visits with her mother. *Id.* at 548. She threw severe tantrums, refused to eat, vomited, and urinated on the floor in public. A.G. had a higher level of anxiety about visits than other children similarly situated. Her behavior gradually improved but would again deteriorate when she visited her mother. She improved significantly once visits were terminated. In counseling, A.G. went from being sad about leaving her mother, to worrying

that she would have to care for M.S. if she returned to her mother, to not wanting to return to her mother and wanting to stay with her foster mother. L.S. suffered an eating problem starting at age 21 months but is now at a healthy weight. L.S. would refuse to eat during the times when visitation would take place. The eating problem relates to visits with her mother.

¶13 A witness opined that termination of Ms. G.'s parental rights would reduce both A.G.'s and L.S.'s anxiety because "at times they still wonder if they will be leaving where they're living." *Id.* at 552.

TRIAL COURT'S DECISION

¶14 The trial court concluded that the statutory elements necessary to terminate Ms. G.'s parental rights had been met and entered an appropriate order doing so.

¶15 Specifically, the court concluded that "[t]here is little likelihood that conditions will be remedied so that [A.G.] or [L.S.] can be returned to their mother in the near future." A.G. Clerk's Papers (CP) at 49. The court found "since late August, 2008, Ms. [G.] has given no testable UA samples – in that time she has had one unable-to-specimen, two no-shows, and four diluted samples." *Id.* at 50. And the court found that "[d]omestic violence is learned behavior. While there is not a necessary connection between being a domestic violence perpetrator and parenting ability, such behavior leads to physical and emotional abuse of children, and sets a poor example." *Id.* at 50-51.

¶16 The court concluded that "[c]ontinuation of the parent-child relationships clearly diminishes the children's prospects for early integration into a permanent and stable home." *Id.* at 52. The court also found, "It is in the best interest of [A.G. and L.S.] to terminate the parent-children relationships." *Id.* at 55. Finally, the court found that "[t]he children shall have no relationship with [M.S.]" *Id.* at 57.

¶17 Ms. G. appealed the trial court's order regarding both A.G. and L.S. We consolidated the appeals.

## DISCUSSION

STANDARD OF REVIEW

¶18 First of all, it is important for us to clarify what we are doing here on appeal. Standards of review dictate when we can intrude upon a decision of a trial court and when we cannot. It is important, then, to spell out the authority of the court and the way in which that authority is exercised when passing on the legal adequacy of the evidence to support the court's findings.

¶19 Our review here is of this trial judge's decision and is not de novo. *See In re Welfare of M.R.H.*, 145 Wn. App. 10, 24, 188 P.3d 510 (2008) (the decision of the trial court "is entitled to deference and this court will not judge the credibility of the witnesses or weigh the evidence"). We review the record to decide whether the court's findings are supported by substantial evidence. *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999). That is, we determine whether the State produced sufficient evidence to support the statutory elements necessary to terminate the parent-child relationship. *See M.R.H.*, 145 Wn. App. at 24.

¶20 Ms. G. argues throughout that the court failed to satisfy the criteria for "substantial evidence" when the State's burden of persuasion—clear, cogent, and convincing or preponderance—is considered. Appellant's Br. at 40, 42, 48. But that approach implicates the State's burden of persuasion, not its burden of production, and the difference is important. *See In re Dependency of C.B.*, 61 Wn. App. 280, 282, 810 P.2d 518 (1991). Whether the burden of persuasion has been met is a question for the trier of fact, here the trial judge, not us. *Id.* We must pass on whether the State has produced sufficient evidence that, if believed, would support the statutory elements required to terminate the legal relationship of this parent with these children. *See M.R.H.*, 145 Wn. App. at 24. And, while the evidence produced by the State may have supported other findings of fact, the

question before us is whether the evidence in this record supports the findings that the court did make. *See K.S.C.*, 137 Wn.2d at 925.

PARENTAL RIGHTS—CONSTITUTIONAL AND STATUTORY STANDARDS

██ ¶21 A parent's right to the care and custody of his or her children is fundamental, and so we will intrude upon that right only with great care. *M.R.H.*, 145 Wn. App. at 23. But, like other fundamental rights, it is held in tension with rights of others, here the rights of these children. *See In re Dependency of A.V.D.*, 62 Wn. App. 562, 567, 815 P.2d 277 (1991) (acknowledging that the "fundamental right is not absolute"). So, family reunification is a priority. RCW 13.34.020. But reunification must be balanced against the child's right to basic nurture, physical and mental health, and safety; ultimately, the child's rights and safety should prevail. RCW 13.34.020.

TERMINATION PROCESS

██ ¶22 Termination of parental rights is a two-step process. *In re Welfare of C.B.*, 134 Wn. App. 942, 952, 143 P.3d 846 (2006). First, the State must show that the six statutory requirements under RCW 13.34.180(1) are established by clear, cogent, and convincing evidence. RCW 13.34.190(1)(a). This means the State must show that the ultimate fact in issue is " 'highly probable.' " *In re Dependency of K.R.*, 128 Wn.2d 129, 141, 904 P.2d 1132 (1995) (internal quotation marks omitted) (quoting *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). The two statutory requirements at issue here are:

> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . .
>
> . . . .
>
> (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1). Second, if the six termination factors are established, the State must show by a preponderance of the evidence that termination is in the best interests of the child. RCW 13.34.190(2); *C.B.*, 134 Wn. App. at 952.

¶23 The State also must show "[t]hat there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.34.180(1)(e). The focus is "whether the identified deficiencies have been corrected." *M.R.H.*, 145 Wn. App. at 27 (citing *K.R.*, 128 Wn.2d at 144). Even where there is evidence that the parent may eventually be capable of correcting parental deficiencies, termination is still appropriate where deficiencies will not be corrected within the foreseeable future. *In re A.W.*, 53 Wn. App. 22, 32, 765 P.2d 307 (1988).

¶24 "What constitutes 'near future' depends on the child's age and the placement circumstances." *In re Welfare of T.B.*, 150 Wn. App. 599, 609-10, 209 P.3d 497 (2009) (quoting *C.B.*, 134 Wn. App. at 954). "Although 1 year may not be a long time for an adult decision maker, for a young child it may seem like forever." *A.W.*, 53 Wn. App. at 32. So a parent's inability to resolve parental deficiencies within 12 months after the child has been declared dependent creates a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. RCW 13.34.180(1)(e).

¶25 The State also must show that " 'all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been offered or provided.' " *A.W.*, 53 Wn. App. at 31 (quoting former RCW 13.34.180(4) (1988)). The State must prove that "it is highly probable that the parent would not improve in the near future." *T.B.*, 150 Wn. App. at 608 (citing *C.B.*, 134 Wn. App. at 956). And finally, on this point, "[a] parent's unwillingness to avail herself of remedial services within a reasonable period is highly relevant to a trial court's determination as to whether the State has

satisfied RCW 13.34.180(1)(e)." *Id.* (citing *In re Dependency of T.R.*, 108 Wn. App. 149, 165, 29 P.3d 1275 (2001)).

THE EVIDENCE

¶26 Ms. G. contends that the State failed to prove she was currently an unfit parent because she availed herself of most of the services offered by the State and showed recent progress toward correcting her parental deficiencies. For example, Ms. G. argues the State did not prove that substance abuse was a current parental deficiency that could not be remedied in the near future.

*Substance Abuse*

¶27 The unchallenged findings of fact suggest otherwise. Ms. G. did not show up for UAs on two occasions around the time of the termination trial, August 30 and October 4, 2008. She was unable to leave a specimen on September 18, 2008. And she had four diluted UAs on September 5, September 26, September 27, and October 1, 2008. A diluted UA "[i]ndicates flushing. Which usually means they would probably be positive for some substance." RP at 925. The court could and did easily find from this evidence that Ms. G.'s substance abuse has not been corrected. A.G. and L.S. had been in foster care for over three years at the relevant times here. There is, then, ample evidence of little likelihood that Ms. G.'s substance abuse will be remedied so that A.G. and L.S. can be returned to her in the near future.

¶28 Ms. G. nonetheless relies on *C.B.*[1] for the proposition that the State may not simply rely on past performance in the face of current improvements toward addressing parental deficiencies. There, the court held, "[W]here a parent produces evidence that she has been improving over a four-month period after the State files a termination petition but before the termination hearing, the State may not rely solely on past performance to prove"

---

[1] 134 Wn. App. 942.

the element set forth in RCW 13.34.180(1)(e). *C.B.*, 134 Wn. App. at 953. But here the trial court relied on testimony of Ms. G.'s failures in UA testing around the time of the termination trial. And certainly that evidence and reasonable inferences from that evidence support the court's findings on this point. *See, e.g.*, *Delgado Guijosa v. Wal-Mart Stores, Inc.*, 144 Wn.2d 907, 915, 32 P.3d 250 (2001) (reasonable inferences from the evidence are enough to prevent a judgment as a matter of law).

### Domestic Violence

¶29  Next, Ms. G. argues the State did not prove that domestic violence was a current parental deficiency that could not be remedied in the near future. She argues that the State did not prove that she has a parental deficiency due to domestic violence because the trial court did not find a connection between being a domestic violence perpetrator and being able to parent.

¶30  The unchallenged findings of fact show that domestic violence is a learned behavior and that Ms. G. needed a domestic violence perpetrator program. But Ms. G. did not follow through with recommendations that she complete a domestic violence perpetrator program. Yes, she was in a program at the time this trial took place. But, even there, her compliance was unknown.

¶31  So, ultimately for our purposes here on appeal, domestic violence remains a parental deficiency. There is a showing that it has not been corrected or that it will not be corrected in the next year.

### Mental Health

¶32  Ms. G. next argues that the State failed to prove that her mental health problems rose to the level of a legally cognizable parental deficiency that could not be remedied in the near future. Specifically, she argues that the evidence here was that her hallucinations did not impact her daily life nor did they present a threat to others.

¶33 She relies on *In re Dependency of T.L.G.*[2] There, the State filed a petition to terminate parental rights based in part on the parents' problems related to anxiety and depression. *T.L.G.*, 126 Wn. App. at 194-95. Specifically, the State alleged that these mental health issues rendered the parents " 'incapable of providing proper care for the children for extended periods of time.' " *Id.* at 195. The court agreed and terminated the parental rights of both parents, finding, in part, that the parents suffered from "significant mental health issues that would require at least three years of specialized treatment" and that "their mental illness rendered them incapable of providing proper care for the children for extended periods of time." *Id.* at 196-97. The Court of Appeals concluded that the State failed to show how the parents' mental health issues related to their ability to care for their children and reversed. *Id.* at 198-206. The court did so because "[m]ental illness is not, in and of itself, proof that a parent is unfit or incapable" and "[t]he court must examine the relationship between the mental condition and parenting ability." *Id.* at 203.

¶34 Here, Ms. G. reported visual and auditory hallucinations since childhood, including always being watched. She did not start counseling as scheduled. And so the possible effects of the hallucinations and possible paranoia on her parenting ability have yet to be gauged. A mental health counselor met with Ms. G. only once and so did not have enough information to diagnose her. The counselor was, of course, unable to connect any of these problems with her ability to parent. The evidence then does not support a finding that Ms. G.'s mental health issues interfere with her ability to parent these children. RCW 13.34.180(1)(e).

¶35 But the evidence here supports the court's findings on both substance abuse and domestic violence. And those findings, in turn, support the statutorily mandated requirement of parental deficiencies that will not be resolved within the near future.

---

[2] 126 Wn. App. 181, 194-95, 108 P.3d 156 (2005).

PROSPECTS FOR INTEGRATION INTO A STABLE HOME

¶36 Next, the State must show that "continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home." RCW 13.34.180(1)(f). The main focus of this element "is the parent-child relationship and whether it impedes the child's prospects for integration, not what constitutes a stable and permanent home." *K.S.C.*, 137 Wn.2d at 927. This statutorily required element " 'necessarily follows from an adequate showing' that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." *T.R.*, 108 Wn. App. at 166 (quoting *In re Dependency of J.C.*, 130 Wn.2d 418, 427, 924 P.2d 21 (1996)).

¶37 Ms. G. contends the trial court's conclusion that "[c]ontinuation of the parent-child relationships clearly diminishes the children's prospects for early integration into a permanent and stable home" is wrong. A.G. CP at 52. But, again, unchallenged findings of fact show that A.G. had a significant social and emotional attachment with her mother but was anxious as to her mother's availability. And her anxiety was likely due to living apart, not due to their relationship before A.G. and L.S. were removed. A.G. and L.S. were removed from Ms. G's home in 2005, when A.G. was four and one-half years old and L.S. was six months old. And they have gradually become detached since then. A.G.'s behaviors deteriorated in the fall of 2007. She threw tantrums, refused to eat, vomited, and urinated on the floor in public. This behavior improved but then deteriorated when the child again visited her mother. L.S. suffered an eating problem starting at age 21 months but is now at a healthy weight. The eating problem corresponded with the visits with her mother. A.G.'s attachment to Ms. G. was anxious "in terms of her mother's availability." RP at 275. And "[A.G.] didn't trust that her mother was going to be there for her or that she would have access to her mother." *Id.* A.G.'s behavior was "far more escalated and

severe" when she visited her mother. *Id.* at 548. L.S. would refuse to eat when visitation took place.

¶38 All of this supports the court's conclusion that the prospects for early integration into a stable and permanent home would be diminished by continuing the parent child relationship.

BEST INTERESTS OF THE CHILD

¶39 Finally, the State must also show that termination is in the best interests of the child. RCW 13.34.190(2); *C.B.*, 134 Wn. App. at 952. "[T]he factors involved in determining the 'best interests' of a child are not capable of specification; rather, each case must be decided on its own facts and circumstances." *A.V.D.*, 62 Wn. App. at 572. Further, "[w]here a parent has been unable to rehabilitate over a lengthy dependency period, a court is 'fully justified' in finding termination in the child's best interests rather than 'leaving [the child] in the limbo of foster care for an indefinite period while [the parent] sought to rehabilitate himself.'" *T.R.*, 108 Wn. App. at 167 (second and third alterations in original) (quoting *A.W.*, 53 Wn. App. at 33).

¶40 Ms. G. contends the State did not prove that termination was in the best interests of A.G. and L.S. But, again, the findings show that A.G.'s behaviors deteriorated when she visited Ms. G., and L.S. suffered an eating problem that correlated to visits with her mother. Experts testified that termination of Ms. G.'s parental rights would reduce both A.G. and L.S.'s anxiety because "at times they still wonder if they will be leaving where they're living." RP at 552. Moreover, at the time of the termination trial, A.G. and L.S. had been in foster care for over three years, since June 20, 2005. There is, then, substantial evidence to support the finding that it is in the best interests of A.G. and L.S. to terminate the parent-child relationship.

¶41 To sum up this portion of the opinion, the trial court's decision to terminate Ms. G.'s parental rights to A.G. and L.S. is well supported in fact and law.

Visitation

¶42 Finally, Ms. G. contends that the trial judge erred by ordering that these children have no relationship with M.S.

¶43 RCW 13.34.130(3) sets out the required consideration for sibling contact in the dependency context: "[i]f the court has ordered a child removed from his or her home pursuant to subsection (1)(b) of this section, the court shall consider whether it is in a child's best interest to be placed with, have contact with, or have visits with siblings." Here, the issue before the trial court was termination, not dependency. Therefore, RCW 13.34.130 does not apply.

¶44 Rather, RCW 13.34.200(3) applies. It provides that "[a]n order terminating the parent-child relationship shall include a statement addressing the status of the child's sibling relationships and the nature and extent of sibling placement, contact, or visits." RCW 13.34.200(3).

¶45 We review the application of a statute de novo. *Cerrillo v. Esparza*, 158 Wn.2d 194, 199, 142 P.3d 155 (2006). We look to the plain language of the statute to then give effect to the legislative intent. *Waste Mgmt. of Seattle, Inc. v. Utils. & Transp. Comm'n*, 123 Wn.2d 621, 629, 869 P.2d 1034 (1994). The language here is unambiguous and the State does not suggest otherwise. The court must "include a statement addressing the status of the child's sibling relationships and the nature and extent of sibling placement, contact, or visits." RCW 13.34.200(3). The trial court here did not do that. RCW 13.34.200(3) does not authorize the trial court to prohibit sibling contact.

¶46 And, although we conclude that the statute is unambiguous, our reading of the statute also furthers the purpose of the statutory scheme, which is to further relationships among siblings:

It is the intent of the legislature to recognize the importance of emotional ties formed by siblings with each other, especially in those circumstances which warrant court intervention into family relationships. It is the intent of the legislature to

encourage the courts and public agencies which deal with families to acknowledge and give thoughtful consideration to the quality and nature of sibling relationships when intervening in family relationships. It is not the intent of the legislature to create legal obligations or responsibilities between siblings and other family members whether by blood or marriage, step families, foster families, or adopted families that do not already exist. Neither is it the intent of the legislature to mandate sibling placement, contact, or visitation if there is reasonable cause to believe that the health, safety, or welfare of a child or siblings would be jeopardized. Finally, it is not the intent of the legislature to manufacture or anticipate family relationships which do not exist at the time of the court intervention, or to disrupt already existing positive family relationships.

LAWS OF 2003, ch. 227, § 1.

¶47 Finally, we question whether the court had jurisdiction over M.S. The juvenile court initially obtains jurisdiction over a minor when he is found to be either a delinquent or a dependent child. *In re Welfare of Key*, 119 Wn.2d 600, 608, 836 P.2d 200 (1992). No finding of dependency was entered as to M.S., and he was not a party to these proceedings. Further, viewing the purpose of the statutory scheme, it was not the intent of the legislature to expand the court's jurisdiction over nondependent children. *See* LAWS OF 2003, ch. 227, § 1.

¶48 We conclude, then, that the trial court did not have the authority to prohibit A.G. and L.S. from having a relationship with M.S.

HOLDING

¶49 We affirm the termination of Ms. G.'s parental rights to A.G. and L.S. and remand to strike the restriction on contact between A.G., L.S., and M.S.

KULIK, C.J., and BROWN, J., concur.

Review granted and case remanded to the Court of Appeals at 169 Wn.2d 1032 (2010).