IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Welfare of L.J., DOB: 11/07/2012, | No. 80245-3-I |
| | DIVISION ONE |
| STATE OF WASHINGTON, DEPARTMENT OF CHILDREN, YOUTH AND FAMILIES, | UNPUBLISHED OPINION |
| Respondent, | |
| v. | |
| KELCY RUTH LOUNSBERRY, | |
| Appellant. | |

CHUN, J. — Kelcy Lounsberry appeals the trial court's order terminating her parental rights. She claims the trial court deprived her of due process by denying her motion to continue the trial. She also challenges the court's findings that (1) there was little likelihood that conditions will be remedied so that her child can be placed with her in the near future and (2) she is unfit to parent. Because the trial court afforded her ample due process, she fails to show prejudice resulting from the denial of the continuance and substantial evidence supports the court's findings, we affirm.

Citations and pin cites are based on the Westlaw online version of the cited material.

BACKGROUND

Dependency Proceedings

On July 26, 2015, police took two-year-old L.J. into protective custody after a neighbor reported finding the child crying alone outside, hungry and in a soaked diaper. The door to L.J.'s home was open and no one was home. A CPS worker contacted L.J.'s mother, Kelcy Lounsberry, when she returned to the home later that day with a man. Both appeared to be under the influence of drugs. Lounsberry was unable to give a clear account as to why L.J. was left alone. Department records revealed that Lounsberry had a history of leaving L.J. with inappropriate caregivers. There were also past reports to CPS that Lounsberry's previous boyfriend hit L.J., Lounsberry had been seen using drugs with L.J. in the car, and L.J. was present during a domestic violence incident involving Lounsberry and another boyfriend. Medical records showed that L.J. had not been seen by a doctor since June 2014.

On July 28, 2015, the Department of Children, Youth and Families (Department) filed a dependency petition. On November 6, 2015, the court entered an agreed order of dependency as to Lounsberry. The father's whereabouts were unknown.[1] L.J. was placed in the care of the Department. The dependency order provided that L.J. may be moved to Lounsberry's home if she participated in a psychological evaluation and the provider recommended reunification, had a daycare provider while she is at work, did not allow L.J. to have unsupervised contact with individuals not approved by the Department,

---

[1] An order of dependency as to the father was later entered on June 10, 2016.

resided in safe appropriate housing, engaged in consistent visitation with L.J., and ensured L.J.'s medical and dental care were up to date. In the interim, Lounsberry was permitted to have one or two supervised visits with L.J. per week.

On January 14, 2016, the court held the first dependency review hearing. The court found Lounsberry had not completed the psychological evaluation and had lost two visit contracts because she did not consistently visit L.J.. The court also noted safety concerns during visits, including her attempt to flee with L.J. at one visit and her attempts to bring unauthorized individuals to the visits.

On June 16, 2016, the court entered a permanency planning order following a review hearing. The court found Lounsberry had not visited L.J. regularly and lost visit contracts because she was late or did not show up at all for visits. The court changed the visitation plan to two supervised visits per month and required Lounsberry to confirm her visit 24- to 48 hours in advance or the visit would be cancelled. The court also ordered that if she lost another visitation contract she needed to come back before court to have visitation reinstated.

On June 25, 2016, Dr. Tatyana Shepel completed the psychological evaluation. Dr. Shepel's diagnostic impressions included mood disorder and personality disorder with histrionic, borderline, and dependent features. Dr. Shepel found that Lounsberry demonstrated minimal insight into her mental health issues and dysfunction and minimal understanding of L.J.'s needs with no

3

acknowledgement of the impact to L.J. of neglect, exposure to domestic violence, multiple caregivers, and an unstable environment.

Dr. Shepel concluded that Lounsberry was not a fit parent for L.J. and her lack of insight, defensiveness, denial, and dysfunctional personality traits hindered her ability to provide an appropriate environment for L.J. and to meet his specific needs. Dr. Shepel also noted that L.J. demonstrated developmental delays and aggressive behavior toward Lounsberry during the parent-child observation session. She expressed "great doubts" in Lounsberry's ability to support and parent a child with special needs. L.J. was placed in a developmental preschool and had an IEP to address his social, emotional and behavioral issues. Dr. Shepel recommended that Lounsberry complete domestic violence classes, group dialectical behavioral therapy (DBT), individual parenting skills training, intensive individual mental health therapy, outpatient support group for drug and alcohol issues, and parent-child therapy with L.J. Department social workers offered the recommended services to Lounsberry.

On December 1, 2016, the court held a dependency review hearing. The court found Lounsberry had made no progress toward correcting her deficiencies, had not visited L.J. regularly, missed three visits, and lost the most recent visit contract on September 8, 2016. From September 2016 until April 2017, Lounsberry had no contact with L.J., including on his birthday in November 2016. The social worker continued to offer services recommended by Dr. Shepel.

4

On October 19, 2017, the court held a dependency review hearing. The court found Lounsberry had only one visit during this reporting period (all others were "no shows" or cancelled) and she had not engaged in any of the services Dr. Shepel recommended. The court ordered her to engage in services recommended by Dr. Shepel and participate in Intensive Family Preservation Services. It also ordered Lounsberry to engage in psychiatric treatment with Dr. JoAnne Solchany and follow recommendations for medication management. The court permitted visitation per prior court orders.

In February 2018, Lounsberry made arrangements to participate in group DBT therapy with a provider who was not contracted through the Department. The social worker notified Lounsberry that the Department would not pay for this provider and referred her to a contracted provider, Integrated Therapy Services Northwest ("Integrated Therapy").

On March 23, 2018, the court entered a permanency planning order following a review hearing. The court found Lounsberry had not visited L.J. regularly, visiting him four times since October 19, 2017 and missing or cancelling five visits.

On June 26, 2018, Dr. Solchany completed Lounsberry's psychiatric evaluation. Like Dr. Shepel's impressions, Dr. Solchany concluded Lounsberry met the diagnostic criteria for mixed personality disorder with histrionic, dependent, and borderline qualities. Dr. Solchany found that Lounsberry struggled to demonstrate consistency and commitment and to understand the

impact her choices and actions have on L.J. Additionally, she struggled to understand the impact of substance abuse on her life and denied she has any substance abuse problems.

Dr. Solchany recommended that Lounsberry engage in DBT therapy as previously recommended for a least a full year, participate in ongoing individual therapy, and participate in child-parent therapy if L.J. is placed with her. Dr. Solchany also recommended a trial of sertraline, an antidepressant/ antianxiety agent. In July 2018, Lounsberry began DBT sessions with Integrated Therapy, which included both individual and group therapy.

Pretrial Termination Proceedings

On July 13, 2018, the State petitioned for termination of parental rights. A trial date was set for November 19, 2018 and was continued to November 27 at Lounsberry's request. On September 13, 2018, the court reinstated visitation on Lounsberry's motion, ordering that she have two visits per month for two hours.

In November 2018, Lounsberry tested positive for cocaine. She also missed every DBT session in November and was expelled from the program. In January 2019, Lounsberry resumed DBT treatment, but continued to miss sessions.

The trial date was continued to January 7, 2019 and again to February 11, 2019 due to the illness of Lounsberry's attorney. On January 30, Lounsberry moved to substitute new counsel and continue the trial to May 13, 2019. The State responded that any continuance should be short, noting that the State

already lost a witness because of the repeated delays. On February 5, 2019, the trial court continued the trial to April 1, 2019, and appointed new counsel Lorraine Roberts to represent Lounsberry.

On April 1, Roberts sought to withdraw, saying that Lounsberry had fired her and would no longer speak to her. Lounsberry missed the hearing on the motion to withdraw because she arrived late. The trial court denied the motion in part because Lounsberry was not present for the hearing. On April 5, Roberts renewed the motion to withdraw, which was denied.

On April 22, the parties appeared for trial and Roberts again renewed her motion to withdraw. After performing a detailed inquiry of Lounsberry on the reasons for the withdrawal request, the court granted the motion for withdrawal and substitution of counsel "with the understanding that the Mother will be immediately assigned new counsel at public expense." The court also ordered that it expected new counsel to be "trial ready" on the newly set trial date of May 20, 2019.

On April 26, new counsel filed a notice of appearance. A week before trial, Lounsberry moved to continue the trial to June 17. The court denied the motion, finding "[t]he trial has been continued multiple times. The court previously ordered parties be ready to proceed on 5/20/19." The case was ultimately sent out for trial on May 30, 2019.

Termination Trial

On May 30, the parties appeared for trial. Lounsberry again requested a continuance, saying for the first time that she needed time to seek expert witnesses. The trial court denied the motion.

At trial, Lounsberry testified that she was participating in group and individual DBT therapy at Integrated Therapy but admitted she had to restart the group DBT therapy because she missed too many sessions in a row. Tamara Davis, a therapist who treated Lounsberry at Integrated Therapy, testified that clients complete the program when they complete three modules twice, and since it takes six months to go through all three modules, the entire process takes a full year. Davis testified that Lounsberry would complete the first round of three modules on June 28, 2019 and would then begin the next six-month phase of the program. She also explained the "four-missed" rule, which means if a client misses four sessions in a row, the client cannot rejoin the module but has to wait until a new module starts again and join that one, essentially starting over.

Tatyana Lats testified she provided individual counseling to Lounsberry at Valley Cities from October 2017 to July 2018. Lats testified that Lounsberry did not attend sessions consistently and while she made some improvement, this was based mainly on her self-reporting and she had completed only 25 percent of her stated goals.

Dr. Solchany testified consistently with her report. She also testified that individuals with personality disorders must want to make changes to their

8

behavior and acknowledge how their behaviors interfere with their ability to function. She also testified that addressing a personality disorder takes a minimum of a year and for some people, it could be two to three years. She continued to recommend medication, which Lounsberry testified she had just started taking. Dr. Solchany testified that a month was not enough time to evaluate the effectiveness of this medication.

Lounsberry also testified she attended a DV support group, but only because it was court ordered, and she denied she had ever been a DV victim. According to the social worker, Lounsberry had been participating in this group for only about two months. Lounsberry also testified she had been attending Social Treatment Opportunity Programs (STOP) for drug and alcohol treatment for about two months, but participated only in group sessions, not individual treatment. And despite testing positive for cocaine in November 2018, she denied using cocaine or having any substance abuse issues. She also testified she was doing the Incredible Years parenting program at Olive Crest. Kerry Shaughnessy, the clinical supervisor at Olive Crest, testified that Lounsberry had just begun the program in early May and she had not yet seen her with L.J.

Jaeah Manson, a professional visitation supervisor, testified that she had been supervising Lounsberry's visits with L.J. since January 8, 2019. She testified that there were two times when Lounsberry involved her boyfriend in the visits even though he was not approved to participate in visits. Manson also testified that she canceled a recent visit after she realized Lounsberry was

recording the visit on her phone. Manson had not given permission to record the visit and it was against the rules to record during a visit. After Manson canceled the visit, Lounsberry called her boyfriend on FaceTime so he could say hello to L.J. Manson told Lounsberry to say good-bye to L.J. but she ignored Manson, holding L.J.'s hand and talking on the phone with her boyfriend. According to Manson, it took 20-30 minutes and a security escort to get L.J. to the car.

The GAL testified that it was not safe for L.J. to be returned to Lounsberry's care in the next six months. The social worker testified that a year is too long for a six-year-old like L.J. to wait. She also testified that L.J. continues to have an IEP to address his special needs.

Following trial, the court granted the petition to terminate Lounsberry's parental rights. The court found there was little likelihood that conditions would be remedied so that L.J. can be placed with her in the near future and that Lounsberry was unfit to parent L.J. Lounsberry appeals.

ANALYSIS

Lounsberry claims the trial court violated her right to due process by denying her motion to continue the trial. She also claims the evidence did not suffice to support the court's findings that there is little likelihood that her parental deficiencies could be remedied so that L.J. could be returned to her in the near future and that she was currently unfit to parent L.J.

Motion to Continue

We review a trial court's denial of a motion to continue trial for manifest abuse of discretion. In re Dependency of V.R.R., 134 Wn. App. 573, 580-81, 141 P.3d 85 (2006). A trial court abuses its discretion when it exercise that discretion based on untenable grounds or reasons. V.R.R., 134 Wn. App. at 581.. For claims alleging that the denial of a motion to continue violates due process rights, the appellant must show either prejudice caused by the denial or that the result of the trial would have likely been different if the continuance was granted. V.R.R., 134 Wn. App. at 581.

Lounsberry contends the trial court violated her right to due process claiming that "the court's insistence on an immediate trial, over [her] objection, deprived her of the right to present all relevant evidence for the court to consider." She contends that no competent attorney could have been prepared on the trial date given the complexity of the case.

When deciding a motion to continue, "the trial court takes into account a number of factors, including diligence, due process, the need for an orderly procedure, the possible effect on the trial, and whether prior continuances were granted." V.R.R., 134 Wn. App. at 581. Here, the trial court properly considered these factors and did not abuse its discretion by denying Lounsberry's request for a seventh continuance on the day of trial. The court had already delayed the trial several times to accommodate Lounsberry and afforded her reasonable due process.

The court first continued the trial for three months because of Lounsberry's counsel's illness. After appointing the first substitute counsel, the trial court continued the trial for another two months to allow attorney Roberts to prepare for trial. The court continued the trial date again when Lounsberry sought new substitute counsel on the day of trial after firing Roberts.[2] The court granted her request for new counsel and continued the trial for another month, but made clear that any new counsel must be available and "trial ready" for the May 20 trial date. Lounsberry did not object to this trial date. And while she claims the case was so complex that no competent counsel would have been able to prepare in the time allotted, Roberts, who was already familiar with the complexity of the case, proposed an earlier date:

> MS. ROBERTS: Your Honor, if I could just make a small suggestion because I've been in the situation of taking a case over when there's been a withdraw[al]. I would ask the Court to set the matter for two weeks so that new counsel can appear [inaudible] their calendar is in front of them versus them having to come in and ask for another motion to continue. This way they will have met each other at least at the hearing, and then the Court can do its calendaring at that point.

> THE COURT: I don't have a problem setting it for two weeks, but I'm also going to put in an expectation on when the trial date is so that when the—the appointment is there, I don't have someone showing up that's completely unavailable in the following four-week period. So, that needs to be clear in the order.

As the court noted, "If I go with Ms. Roberts's suggestion, I could set trial for May 6th." The parties ultimately agreed to schedule a pretrial conference on May 3, with a trial date of May 20.

---

[2] Lounsberry's failure to appear on time for the hearing on the motion to withdraw and substitute counsel caused further delay and the court did not appoint new counsel until April 22, the day the case had been sent out for trial.

And apparently nothing in the record shows that new counsel, Abra Conitz, informed the court at the pretrial conference that she would need more time to prepare. The court set the pretrial conference two weeks before trial so Conitz would have time to assess whether another continuance was warranted at that time. Instead, a week before trial, she moved to continue the trial for another month, claiming she needed the additional time to review discovery and "to fully explore all other options besides trial, including a settlement agreement and possible voluntary relinquishment." In denying the motion, the court reiterated its previous order that the "parties be ready to proceed on 5/20/19." Counsel then had another 10 days to prepare for trial since the case did not get sent out to trial until May 30. The record does not support Lounsberry's claim that the trial court insisted on an immediate trial over her objections.

Lounsberry fails to show the court deprived her of due process. The trial court granted her a month continuance to allow her third attorney to prepare for trial and she had ample notice that the court expected new counsel to be "trial ready" on May 20. She did not object to that date until a week before trial and had another 10 days to prepare for trial once the continuance was denied. Nor did she claim she needed time to seek expert witnesses until the day of trial and did not explain why she could not have done so earlier.

Lounsberry also identifies no prejudice resulting from the trial court's denial of the continuance. She claims a continuance would have permitted her "to rebut the Department's allegations," noting she sought the continuance to

13

seek an expert witness to review Dr. Shepel's 2016 psychological evaluation and obtain an "updated evaluation." But the most recent evaluation was completed just months before the original trial date. The 2018 evaluation agreed with the conclusions in the 2016 evaluation and actually expanded the recommendations. And as discussed below, substantial evidence supported the court's finding that Lounsberry had not substantially complied with the recommendations. She fails to show how a continuance would have changed this fact. As the trial court found, her failure to make substantial progress in correcting her deficiencies within twelve months of the entry of the dependency (entered four years ago) creates a rebuttable presumption that she will not do so in the future. As discussed below, she failed to rebut that presumption. Lounsberry does not show how she would have rebutted it if a continuance had been granted. Lounsberry fails to show that the trial outcome would have likely been different if the continuance was granted. The trial court did not abuse its discretion in denying the continuance. Thus, the due process claim fails.

Findings in Support of Termination

Lounsberry challenges the court's findings that (1) there is little likelihood her deficiencies will be remedied so that L.J. can placed with her in the near future[3] and (2) she is currently unfit to parent L.J.

When the trial court has weighed the evidence in a proceeding to terminate parental rights, our review is limited to determining whether the court's

---

[3] While Lounsberry does not assign error to the court's finding 2.30 that "[t]here is little likelihood that conditions will be remedied so that [L.J.] can be placed with Ms. Lounsberry within

findings of fact are supported by substantial evidence and whether those findings support the court's conclusions of law. In re Dependency of P.D., 58 Wn. App. 18, 25, 792 P.2d 159 (1990). "'Substantial evidence' is evidence in sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." In re Welfare of T.B., 150 Wn. App. 599, 607, 209 P.3d 497 (2009) (quoting World Wide Video, Inc. v. City of Tukwila, 117 Wn.2d 382, 387, 816 P.2d 18 (1991)). "Because of the highly fact-specific nature of termination proceedings, deference to the trial court is 'particularly important.'" In re Parental Rights to K.M.M., 186 Wn.2d 466, 477, 379 P.3d 75 (2016) (quoting In re Welfare of Hall, 99 Wn.2d 842, 849, 664 P2d 1245 (1983)). In determining whether substantial evidence supports the trial court's findings, we do not weigh the evidence or the credibility of witnesses. In re Dependency of E.L.F., 117 Wn. App. 241, 245, 70 P.3d 163 (2003). We treat unchallenged findings as verities on appeal. P.D., 58 Wn. App. at 30.

To terminate parental rights, the Department must satisfy a two-pronged test. In re Dependency of K.N.J., 171 Wn.2d 568, 576, 257 P.3d 522 (2011). The Department must first prove the statutory elements set forth in RCW 13.34.180(1)(a) through (f) by clear, cogent, and convincing evidence. K.N.J., 171 Wn.2d at 576-77. Evidence is clear, cogent, and convincing if it established the ultimate fact in issue as "'highly probable.'" In re K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995) (quoting In re Sego, 82 Wn.2d 736, 739,

_____

the near future," she challenges the evidence in support of this finding in her issue statements and argument.

513 P.2d 831 (1973)). If the trial court finds that the Department has met its burden under RCW 13.34.180, it may terminate parental rights if it also finds by a preponderance of the evidence that termination is in the "best interest" of the child. K.N.J., 171 Wn.2d at 577.

> The six statutory elements the Department must prove are:
>
> (a) That the child has been found to be a dependent child;
>
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
>
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
>
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
>
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . .; and
>
> (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1). Due process protections also require that a court make a finding of unfitness before terminating parental rights. K.M.M., 186 Wn.2d at 479. "Satisfying all six of the statutory elements raises an implied finding of parental unfitness." K.M.M., 186 Wn.2d at 479.

1. Deficiencies Remedied in Near Future

Lounsberry contends the State failed to prove RCW 13.34.180(1)(e), that there was little likelihood conditions will be remedied so L.J. could be returned to

her in the near future. She claims that the State relied on her past problems, not her current progress. We disagree.

> The statute creates a rebuttable presumption for element (e):

> A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. The presumption shall not arise unless the petitioner makes a showing that all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future have been clearly offered or provided.

RCW 13.34.180(1)(e). The presumption only shifts the burden of production to the parent; the State retains the burden of persuading the court that it is highly probable the parental deficiencies would not have improved in the near future. In re Welfare of C.B., 134 Wn. App. 942, 955-56, 143 P.3d 846 (2006). But termination is appropriate even where the evidence shows that the parent may eventually be able to correct deficiencies if those deficiencies will not be corrected in the near future. In re Welfare of A.G., 155 Wn. App. 578, 590, 229 P.3d 935 (2010). The "near future" is determined from the child's point of view and depends on the age of the child and the circumstances of the child's placement. K.M.M., 186 Wn.2d at 486; C.B., 134 Wn. App. at 954.

The trial court found the Department offered Lounsberry the services recommended by both Dr. Shepel and Dr. Solchany. We accept this unchallenged finding as a verity on appeal. The court also made the following unchallenged findings:

> 2.30 There is little likelihood that conditions will be remedied so that [L.J.] can be placed with Ms. Lounsberry within the near future. The only credible evidence on this issue estimated it would take at least

12 months of consistent participation and progress by the mother before [L.J.] could possibly be placed in her care. Ms. Lounsberry first testified that she was able to parent [L.J.] immediately and then amended her testimony to indicate she would need an additional 5 months. Whether 5 months or 12 months, either amount of time is too long for 6 year old [L.J.] to wait on the possibility of progress by Ms. Lounsberry in correcting her parental deficiencies.

2.31 Ms. Lounsberry's failure to make substantial progress in correcting her parental deficiencies within 12 months of entry of the dependency and disposition orders (entered 4 years ago) creates a rebuttable presumption that she will not do so within the near future.

Lounsberry failed to rebut the presumption. The evidence established that it was highly probable that Lounsberry's parental deficiencies would not have improved in the near future.

Lounsberry assigns error to these findings:

2.29 Ms. Lounsberry only recently began authorized (by DCYF) parenting instruction. She went to two other programs on her own and was repeatedly informed that these other programs did not meet required criteria. Like all of her other ordered services, Ms. Lounsberry was repeatedly informed of the requirement that she participate in this service by both emails and letters from DCYF.

. . .

2.32 Any progress made by Ms. Lounsberry in correcting her parental deficiencies has been minimal (if any) to date. These parental deficiencies, which directly relate to her ability to parent [L.J.], include failure to satisfactorily address issues related to her mental health diagnosis, her history of controlled substance use and her history as a victim/survivor of DV.

Substantial evidence supports these findings. The clinical supervisor of the Incredible Years program testified that Lounsberry had just begun parenting instruction on May 2, 2019, and she had not yet observed Lounsberry with L.J. This was well beyond the originally scheduled termination trial date and nearly three years since Dr. Shepel recommended individual parenting instruction. While Lounsberry points out that she attended two other parenting classes,

neither were Department authorized, one was just a four-hour class and the other was a course she did not complete.

The evidence at trial also established that Lounsberry made minimal progress in DBT therapy. In 2016, Dr. Shepel recommended she participate in DBT therapy, but she did not begin this therapy until two years later and by the time the termination trial was originally scheduled to begin, she had missed four consecutive appointments resulting in her expulsion from the program. By the time trial did proceed, she had not even finished the first six-month portion and still needed to complete another six months to complete the program. Dr. Solchany also testified that addressing a personality disorder through DBT therapy takes a minimum of a one year and could take up to two to three years.

Lounsberry's participation in a DV support group and the STOP drug and alcohol treatment program was likewise minimal and unlikely to address her substance abuse issues and DV history. She only recently began attending these programs, did not provide any documentation of her attendance at the DV support group and continued to deny at trial that she was ever a DV victim, testifying she attended the group only because it was court ordered. Similarly, she denied having any substance abuse issues despite testing positive for cocaine in November 2018, when the termination trial was originally scheduled. Additionally, as the court found, she did not complete her 90-day urinalysis requirement ordered four years ago until "possibly" recently.

Moreover, both the Department social worker and the GAL testified that L.J. could not be safely returned to Lounsberry in the near future. The social worker testified that she had concerns for L.J.'s safety during visits. The GAL testified it would not be safe to return L.J. to Lounsberry's care in the next six months, as she would need to "take care of herself" before she could care for L.J.. The social worker testified that Lounsberry would need to be fully engaged in her services, making changes and progress, for at least a year before she could recommend L.J. begin a transition to Lounsberry's care. She cautioned that her one-year estimate was a "best case scenario" based on Lounsberry's full engagement, something she had not experienced in her two and a half years working with Lounsberry. She also testified that a year is too long for a six and a half year old child like L.J. to conceive of. See In re A.W., 53 Wn. App. 22, 32, 765 P.2d 307 (1988) ("Although 1 year may not be a long time for an adult decision maker, for a young child it may seem like forever.").

Lounsberry did not produce any credible evidence that she made "substantial progress" and "improvement," as she claims. While she testified that she believed she was making progress and "absolutely" felt like a different person than she was at the beginning of the dependency, the trial court found she lacked credibility. The trial court also found her "lack of progress is further evidenced by [her] lack of contact with [L.J.]," noting her visits decreased since they started and she continued to violate the visitation rules.

Substantial evidence supports the court's finding that there is little likelihood that conditions will be remedied so that L.J. could be placed with Lounsberry in the near future. Even though Lounsberry points to evidence that she may eventually be able to correct parental deficiencies, termination was appropriate because the evidence showed the deficiencies would not be corrected within the near future. A.G., 155 Wn. App. at 590.

2. Parental Unfitness

Lounsberry next claims insufficient evidence supported the court's finding that she is unfit to parent L.J. and that "[L.J.]'s physical and psychological health would be at risk if he were placed with his mother at this time." She contends the court ignored her current progress and instead relied on an outdated psychological evaluation. We disagree.

When, as here, all the requirements of RCW 13.34.180(1) have been met, there is an implied finding of parental fitness. K.M.M., 186 Wn.2d at 490. "[T]he legislature did not intend for parental fitness to be considered in isolation. . . . Rather the totality of the parent-child relationship is already part of the unfitness inquiry." K.M.M., 186 Wn.2d at 491. In making unfitness determinations, courts consider whether the parent can provide for the specific child's basic, individual needs. K.M.M., 186 Wn.2d at 491-92.

Substantial evidence supports the court's finding of current parental unfitness. The social worker testified that L.J. would be at risk either physically or psychologically if placed with Lounsberry at this time "due to her mental health

status." The social worker testified that L.J. picks up Lounsberry's inappropriate behaviors and emulates them, complaining about the visit site and talking about injuring CPS workers. She also testified that Lounsberry's failure to address her mental health issues over the course of the four-year dependency affected her ability to parent. The trial court found the social worker's testimony credible. Additionally, Dr. Solchany concluded that Lounsberry struggles to understand the impact her choices and actions have on L.J.

While Lounsberry points to testimony that her visits with L.J. were "fun and positive," the visit supervisor testified that L.J. resisted her displays of affection and at times did not want to play with her at all. At a recent visit, Lounsberry "cussed at" the supervisor and mocked her in front of L.J. When it was time for the next visit, L.J. at first told the supervisor he did not want to go. The GAL testified that L.J. had behavior changes after visits and his teacher noticed his behavior was mostly negative the day after visits with Lounsberry. The GAL also testified that L.J. called Lounsberry "his friend" instead of his mom, which tracked her observation that they interacted as peers. We defer to the trial court to weigh the evidence and resolve conflicts in testimony. State v. Merritt, 200 Wn. App. 398, 408, 402 P.3d 862 (2017).

Lounsberry also contends that "the primary evidence" of her alleged deficiencies was "an outdated psychological evaluation giving her a mental health diagnosis – for which she had been receiving intensive DBT services for almost a year at the time of trial." The record does not support these assertions.

The trial court referred to both Dr. Shepel's 2016 psychological evaluation and Dr. Solchany's 2018 psychiatric evaluation in its findings. The 2018 evaluation was completed just a few months before the original termination trial date and as discussed above, Dr. Solchany arrived at the same mental health diagnosis as Dr. Shepel and recommended the same services. This is unsurprising considering Lounsberry did not engage in any of the services recommended by Dr. Shepel. And while she finally began DBT therapy in July 2018, only after Dr. Solchany recommended it again, she had to restart the program in January 2019 after being removed in November 2018 for missing too many sessions. Thus, even though she had "attended" DBT therapy over the course of almost a year, she had not successfully completed the first six months of the program by the time of trial. Substantial evidence supports the court's finding of parental unfitness.

We affirm.

WE CONCUR:

_____ Chun, J.

_____       _____
                              Dwyer, J.

23